# <u>Exhibit A</u>

# Receiver Order

ID# 2021-0068653-CV

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**05106700**

Mary Staley Clark - 28
MAY 26, 2021 01:15 PM

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

## IN THE SUPERIOR COURT OF COBB COUNTY
## STATE OF GEORGIA

CHOATE CONSTRUCTION COMPANY,     )
                                    )
        Plaintiff,                     )
                                    )
v.                                       )    Civil Action No.: 05-1-6700
                                       )             18-1-5244
INTERFINANCIAL MIDTOWN, INC.,       )
PIEDMONT FOUNTAINS, LLC, and SCOTT L. )
LEVENTHAL,                       )
                                    )
        Defendants.                  )

## <u>ORDER APPOINTING RECEIVER</u>

This matter is before the Court on Plaintiff Choate Construction Company's ("Choate") Renewed Emergency Motion for Appointment of a Special Master/Auditor and Receiver. A hearing on Plaintiff's Motion was held on May 11, 2021, which all parties attended and for which all parties received proper notice. Having considered the Choate's Motion, the parties' arguments and Briefs, and the evidence presented and all pleading of record in both Civil Action Nos. 05-1-6700 and 18-1-5244, the Court makes the following findings of fact and conclusions of law:

1. On November 21, 2016, this Court in the matter styled <u>Choate Construction Company v. Interfinancial Midtown, Inc. et. al.</u>, CAFN: 005-1-6700-48, entered a Final Judgment (the "Choate II Final Judgment") against Defendant Scott L. Leventhal ("Leventhal") personally for manipulating the various businesses he owned and controlled to perpetrate a scheme of fraudulent transfers to avoid paying monies owed to Choate. (<u>See</u> Exhibit P-1; <u>see also</u> <u>Interfinancial Midtown, Inc. et. Al. v. Choate Construction Company</u>, 343 Ga. App. 793, 794 (2017)). The amount of the Choate II Final Judgment entered against Leventhal was $1,772,158.15 (inclusive of $40,300 in punitive damages) plus post-judgment interest accruing at the legal rate from the date of the Final Judgment until paid in full. (<u>See id.</u>).

883228.1

2. Leventhal has not paid Choate the amount due under the Choate II Final Judgment and post-judgment interest continues to accrue at the applicable legal rate. As of the hearing date in this matter, the amount of due under the Choate II Final Judgment with accrued interest exceeded $2.2 million. (See Choate's Brief in Support of its Renewed Emergency Motion for Appointment of Special Master/Auditor and Receiver ("Choate's Brief") at p. 1).

3. Since entry of the Choate II Final Judgment, Choate has pursued post-judgment discovery and employed available legal remedies in an attempt to collect from Leventhal, but those remedies have been ineffective. (See Choate's Reply Brief at p. 8-9 and Exhibits 2-6 thereto; see also Exhibits P-23-P-26).

4. Leventhal's assets, including his interests in, and income from, companies he owns or controls, are chargeable with payment of the Choate II Final Judgment.

5. Leventhal, both for himself and for the companies he owns, manages, and controls, has repeatedly withheld relevant information from Choate and intentionally misrepresented and misled both Choate and the Court at to what assets he possesses for satisfaction the Choate II Final Judgment, rendering Choate's efforts to employ its legal remedies meaningless. (See Exhibits P-2, P-3, P-4, P-6-P11, and P-13 at ¶4 and Exhibit 1). Specifically, the evidentiary record demonstrates that:

    a. **Leventhal Lied to Choate About his Assets in Response to Post-Judgment Discovery.**

        i. On July 2, 2018, Leventhal testified under oath in verified responses to Choate's Interrogatories that the only assets that he possessed with a fair market value of more than $5,000.00 were a Rolex Watch, a Cadillac Escalade, and real estate at 5887 Riverstone Circle, Atlanta, Georgia 30339. (See Exhibit P-2 at p. 9). Leventhal also produced personal financial statements to Choate in response to its requests for documents representing that as of December 31, 2017, Leventhal's liabilities (excluding the Choate II

2

Final Judgment) exceeded his assets by more than $600,000.00 (i.e. that he was "balance sheet insolvent"). (See Exhibit P-3 at p. 13).

ii. Leventhal deliberately withheld production of consolidated financial statements that he prepared and provided to banks and lenders to obtain credit, specifically Bank of the Ozarks, and that contradicted his sworn testimony to Choate about his available assets. (See Choate's Motion; see also Exhibit P-4).

iii. In contrast to his interrogatory responses and the personal financial statements he produced to Choate, the consolidated financial statements that Leventhal issued in April 2018 reflected his net worth as of December 31, 2017 to be $6,302,253.00 – even after accounting for payment of the Choate II Final Judgment. (See Exhibit P-4 at p. 22-23). Unlike the personal financial statement that he produced to Choate for the same period, Leventhal in his consolidated financial statements specifically included the Choate II Final Judgment as a contingent liability and accounted for its payment out of the pool of consolidated assets. (Id. at p. 23, 28-29).

iv. While Leventhal argues that the consolidated financial statements reflect the assets of independent companies and not his personal assets, Leventhal repeatedly represented in the consolidated financial statements at the time they were issued that they, "present fairly, in all material respects, *my* consolidated position … and the consolidated results of *my* operations and *my* cash flows." (Id. at p.1, 8, 13, 18).

b. **Leventhal Lied to Choate to Hide Salary Payments that He Was Making to Himself from Trillist that Choate Could Have Garnished.**

i. On April 9, 2020, Leventhal as President and CEO of The Trillist Companies, Inc. represented under penalty of perjury in a Schedule of

3

Average Monthly Payroll Costs submitted as part of a Paycheck Protection Program ("PPP") loan application that his Actual Gross Wages as an employee of The Trillist Companies, Inc. for the period from January 1, 2019 through December 31, 2019, were $187,499.88. (Exhibit P-13 at ¶ 4 & Ex. 1, p. 5, 8).

   ii. The CARES SBA-PPP: Employee Detail From 01/01/19 To: 12/31/19 that was also submitted by Leventhal under penalty of perjury along with the same PPP loan application further evidences that his salary was paid by The Trillist Companies, Inc. to Leventhal from April 2019-August 2019. (Exhibit P-13 at ¶ 4 & Ex. 1, p. 5, 11).

   iii. Even though Trillist was paying Leventhal a salary, Trillist, whose day-to-day operations are run by Leventhal as its CEO/COO, did not produce responsive documents reflecting its payment of any salary to Leventhal in response to Choate's post-judgment requests. In fact, in both May 2019 and June 2019, Trillist specifically told both Choate and the Court that it did not have any documents reflecting payments to Leventhal. (Exhibit P-10 and P-11).

6. Leventhal has also been dissipating assets charged with payment of the Choate II Final Judgment by continuing to draw on a $1,000,000.00 revolving line of credit ("Blue Horseshoe LOC") that he issued to himself through Blue Horseshoe, LLC, which he owns and controls. (Exhibit P-22). According to his General Ledgers, Leventhal since entry of the Choate II Final Judgment has continued to draw hundreds of thousands of dollars against the Blue Horseshoe LOC without making any payments and despite being in default under the terms of the Blue Horseshoe LOC. (See Exhibit P-6 and P-22). Furthermore, under the terms of the line of credit, Blue Horseshoe can setoff any property of Leventhal in Lender's possession – which should otherwise be distributed to Choate pursuant to its charging order - against amounts owed to it under the Blue Horseshoe LOC.

4

(See Exhibit P-22).  After setting off the debt, Leventhal can continue to draw on the revolving line of credit as he has done all along without making any distributions out of Blue Horseshoe to avoid paying Choate.

7.  Leventhal's business partner in The Trillist Companies, Inc., Joseph Kavana, recently asserted a counterclaim against him that that seeks to remove Leventhal as CEO/COO of Trillist for allegedly breaching their Shareholders' Agreement by, amongst other things, "[operating] Trillist as a sole proprietorship, unlawfully paying himself (and others) millions of dollars while defaulting on numerous debt obligations, blocking Mr. Kavana from accessing Trillist's bank accounts, withholding key financial documents and making irreversible changes to Trillist's organizational structure." (Exhibit P-13, ¶ 5 & Ex. 2).

8.  Additionally, on May 7, 2021, Leventhal was sued by KGH International, LLC, in Florida state court for breach of fiduciary duty for allegedly engaging in a scheme to divert assets from Choate by transferring them to The Trillist Companies, Inc. and TPKG 13th Street Sponsor, LLC.  (See Choate's Supplemental Brief in Support of its Renewed Emergency Motion for Appointment of Special Master/Auditor and Receiver).

9.  Leventhal's established record in this case of manipulating the businesses that he owns and controls to engage in fraudulent transfers to avoid paying Choate, his ongoing misrepresentations about his available assets in post-judgment discovery to evade and render meaningless Choate's legal remedies, the lawsuits that he is embroiled in with Mr. Kavana suggesting the possibility that he is diverting assets into the companies he controls to avoid paying Choate, and his ongoing actions to dissipate of his assets and avoid making distributions that would be subject to Choate's charging order by incurring debts to the companies he owns, manages, and controls (specifically, Blue Horseshoe Investments, LLC) all constitute extraordinary circumstances and give rise to a manifest danger of continued loss, destruction, and dissipation of and material injury to Choate and Choate's interests in Leventhal's assets.  See D.C. Micro Development, Inc. v. Lang, 259 Ga. App. 611, 578

S.E.2d 251 (2003); <u>Lemans Associates Limited Partnership v. Lemans Apartments</u>, 268 Ga. 396, 489 S.E.2d 831 (1997).

10. The record also reflects an imminent and urgent need for the appointment of a receiver because Leventhal is actively marketing and on the cusp of selling two of Trillist's primary assets, the Yoo on the Park project and property located at 1122 Crescent Avenue, Atlanta, GA, in which he holds an interest and stands personally to benefit financially from their sale through his ownership and control of The Trillist Companies, Inc., Tivoli Investment Holdings, LLC, and Blue Horseshoe Investments, LLC.  (<u>See</u> Choate's Renewed Motion, at Exhibit 5-8; Choate's Reply Brief; Exhibits P-13 at ¶ 6, Ex. 3, p. 192 and P-16-P-19).

11. The Yoo on the Park project as of the time of the hearing was already under a Letter of Intent ("LOI") with a potential buyer.  (<u>See</u> Choate's Reply Brief).

12. Proceeds from the sale of the Yoo on the Park that are to be distributed to Leventhal through his ownership of Blue Horseshoe Investments, LLC and The Trillist Companies, Inc. are chargeable with payment of the Choate II Final Judgment.

13. Leventhal in his consolidated financial statements for December 31, 2017, held out to banks and lenders that his interests in Trillist's Yoo on the Park project and its property located at 1122 Crescent Avenue, Atlanta, GA, were chargeable with the Choate II Final Judgment.  (Exhibit P-4 at p. 23).

14. O.C.G.A. § 9-8-3 authorizes the appointment of a receiver, "to take possession of and hold, subject to the direction of the court, any assets charged with the payment of debts where there is manifest danger of loss, destruction or material injury to those interested."

15. Additionally, in fraudulent transfer cases such as this, O.C.G.A. § 18-2-77 broadly authorizes the Court to appoint a receiver "to take charge … of other property of the transferee [i.e. Leventhal]" and to grant "any other relief the circumstances may require."

16. The appointment of a receiver is appropriate where the person who is managing the property seems inimical to its best interests and where their actions have the effect of rendering any remedy at law

meaningless.  D.C. Micro Development, Inc. v. Lang, 259 Ga. App. 611, 578 S.E.2d 251 (2003);
Warner v. Warner, 237 Ga. 462 (1976).

17. Further, this Court has broad discretion to decide whether the circumstances are sufficiently clear
and urgent enough to warrant a receiver even though the facts relevant to the determination are in
conflict.  Nayyar v. Bhatia 348 Ga. App. 789 (2019).  Evidence, "suggesting the **possibility** that
[assets are] being diverted and that assets might be dissipated before the case can be resolved," has
been held to be sufficient to support the appointment of a receiver.  D.C. Micro Development, Inc.
v. Lang, 259 Ga. App. 611, 578 S.E.2d 251 (2003).

18. Leventhal's argument that the Notice of Appeal of this Court's Order Appointing a Special
Master/Auditor deprives this Court of jurisdiction to appoint a receiver is rejected.  It is well-
established that "[a] notice of appeal divests the trial court of jurisdiction to supplement, amend,
alter, or modify the judgment while the appeal of that judgment remains pending. However . . . .
[t]he notice of appeal does not deprive the trial court of jurisdiction as to other matters in the same
case not affecting the judgment on appeal." Fred Jones Enterprises, LLC v. Williams, 331 Ga. App.
481, 483 (2015) (citations and quotations omitted).  Georgia law draws a sharp distinction between
the powers and authority of Special Masters and Receivers.  A&M Hosps., LLC v. Alimchandani,
351 Ga. App. 310, 314 (2019), reconsideration denied (July 2, 2019), cert. denied (Feb. 10, 2020)
(other citations omitted).  The appointment of a receiver is entirely different relief that was not
granted in the Order Appointing a Special Master that is on appeal.  This Court therefore is not
deprived of jurisdiction to appoint a receiver by Leventhal's appeal.

19. The *proposed* orders submitted by Judge Bodiford in his role as special master for purposes of post-
judgment discovery following the June 4, 2019, hearing on the parties' discovery motions were
never entered by the Court and are of no force or effect.

20. Leventhal's argument that appointment of a receiver is barred by res judicata is rejected.  Res
judicata does not preclude Choate from seeking post-judgment remedies in collection.  Further,
Leventhal confuses res judicata with the related doctrine of collateral estoppel, which "precludes

7

the re-adjudication of an *issue*"—as opposed to a claim—"that has previously been litigated and adjudicated on the merits." <u>Waldroup v. Greene Cty. Hosp. Auth.</u>, 265 Ga. 864, 867 (1995). Because the appointment of a receiver is a *remedy*, not a separate cause of action, the appropriateness of appointing a receiver is a question of *issue preclusion*, not *claim preclusion*. Collateral estoppel differs from res judicata in one critical respect: collateral estoppel "precludes only those issues ***that were actually litigated and decided*** in the previous action, or that necessarily had to be decided in order for the previous judgment to have been rendered." *Id.* (emphasis added). The court in the 05 Case did not appoint a Receiver, or rule on any request for the appointment of a Receiver, to take charge of Leventhal's assets. Thus, there is no collateral estoppel—particularly where the facts that underlie Choate's request did not exist while the 05 Case was pending.

Given these findings of fact and conclusions of law and for good cause shown, the Court concludes that, pursuant to the separate and independent statutory grounds of O.C.G.A. §§ 9-8-1, 9-8-3, and 18-2-77, the appointment of a receiver to marshal, preserve, and provide oversight of Leventhal's assets charged with payment of the Choate II Final Judgment is necessary to protect Choate's rights and to prevent manifest and imminent loss, destruction, and/or dissipation of such assets of Leventhal. The Court further concludes that immediate and irreparable injury may result to Choate in the event a receiver is not appointed to oversee and preserve all such assets of Leventhal. THEREFORE, THE COURT HEREBY **GRANTS** Choate's Motion for the appointment of a receiver and ORDERS the following:

1. This Court hereby takes exclusive jurisdiction and possession of the assets ("Receivership Assets"), of whatever kind and wherever situated, of Defendant Scott L. Leventhal.

2. Until further Order of this Court, **S. Gregory Hays**, (hereinafter the "Receiver") at **Hays Financial Consulting, LLC**, is hereby appointed to serve without bond as receiver for the estate of Defendant Scott L. Leventhal ("Receivership Estate").

## I.    <u>Asset Freeze & Injunction</u>

3. Except as otherwise specified herein and as necessary for the Receiver to carry out his powers and

8

duties, all Receivership Assets are frozen until further order of this Court. Defendant Leventhal and all other persons, businesses, financial institutions, and entities with direct or indirect control over any Receivership Assets, other than the Receiver, are hereby restrained and enjoined from directly or indirectly transferring, withdrawing, setting off, receiving, changing, selling, pledging, assigning, liquidating, encumbering, or otherwise disposing of or withdrawing such assets. This freeze shall include, but not be limited to, Receivership Assets that are on deposit with financial institutions such as banks, brokerage firms and mutual funds or in the possession or held or paid for the benefit of Leventhal by any family member, relative, officer, director, partner, employee, business, or other agent or affiliate of Defendant Leventhal.

4. Leventhal shall be further enjoined from taking any action or making any decision without the prior written approval of the Receiver that may affect or impact any Receivership Assets or the Receivership Estate.

5. Leventhal shall be further enjoined from transferring any funds or directing or approving the transfer of any funds into or out of any bank account, investment account, or other account that he controls without notifying the Receiver and obtaining the Receiver's prior written consent to the transfer of funds.

## II.    General Powers and Duties of Receiver.

6. The Receiver shall have all powers, authorities, rights and privileges heretofore possessed by Leventhal with respect to the Receivership Assets under applicable state and federal law and under any governing charters, by-laws, articles, contracts, and/or agreements, in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of O.C.G.A §§ 9-8-1, 9-8-3, and 18-2-77.

7. No person, other than the Receiver, shall possess any authority to act by or on behalf of the

Receivership Estate.

8. In addition to the specific provisions in Sections III through XIII below, the Receiver shall have the following general powers and duties:

A. To use reasonable efforts to determine the nature, location and value of all Receivership Assets, including but not limited to, including, but not limited to, property interests, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights, ownership interests, stocks, membership interests, partnership interests, and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Leventhal owns, possesses, has a beneficial interest in, or controls directly or indirectly;

B. To communicate directly with and coordinate and cooperate with Special Master/Auditor Patrick Braley in identifying the nature, location, and value of all Receivership Assets;

C. To require the production by Defendant Leventhal and any affiliated business entity owned, managed, or controlled by Defendant Leventhal of any documents, financial and accounting records, shareholders' agreements, membership agreements, partnership agreements, employment records, tax returns, financial statements, computer files, computer databases, and any and all other documents and records evidencing, relating, or pertaining to any assets chargeable with satisfaction of the Final Judgment and which are to be provided or paid to the Receiver under this Order;

D. To take custody, control and possession and to the turnover of all Receivership Assets and records relevant thereto from Leventhal or any other person or entity in possession of the same, including, but not limited to, property interests, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights, ownership interests, stocks, membership interests, partnership interests, and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Leventhal owns, possesses, has a beneficial interest in, or controls directly or indirectly; to sue for and collect, recover, receive and take into possession from third parties all Receivership Assets and records relevant thereto;

E. To exercise all voting rights and other rights possessed by Leventhal under any stockholders' agreement, membership agreement, partnership agreement, governing charters, by-laws, or other similar agreements;

F. To manage, control, operate and maintain the Receivership Estate and hold in his possession, custody and control all Receivership Assets, pending further Order of this Court;

G. To use Receivership Assets for the benefit of the Receivership Estate, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

H.  To open bank accounts, to close bank accounts and to change the names of any signatories on such accounts as the Receiver deems appropriate in his sole discretion;

I.  To take any action which, prior to the entry of this Order, could have been taken by Leventhal or his managers, consultants, trustees, and agents;

J.  To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers;

K.  To take such action as necessary and appropriate for the preservation of Receivership Assets or to prevent the dissipation or concealment of Receivership Assets;

L.  To issue subpoenas for documents and testimony consistent with the Georgia Rules of Civil Procedure;

M.  To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

N.  To pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estate;

O.  To oversee and exercise approval authority over any decision or action by Leventhal which may directly or indirectly impact the Receivership Assets or Receivership Estate;

P.  To oversee and exercise approval authority all transfers of funds by Leventhal from any bank account that he owns or controls to or from any family member, significant other, or business entity that he owns, has an interest in, or controls;

Q.  To render reports to the Court as set forth in Section XI below and as otherwise directed or requested by the Court;

R.  To make payments or distribute Receivership Assets to Choate pursuant to any levy, garnishment, charging order, or other legal remedy issued by Choate to the Receiver for satisfaction of the Choate II Final Judgment;

S.  To communicate directly with all banks and financial institutions to ensure that no distribution or transfer of Receivership Assets is made by Leventhal (personally or as the authorized representative of a Leventhal controlled company) without notice to and the express approval and consent of the Receiver;

T.  To liquidate Receivership Assets for purposes of payment of the Choate II Final Judgment with the approval of the Court;

U.  To approve a reasonable budget for living expenses and to pay such amounts to Leventhal

11

out of the Receivership Estate;

V. To petition the Court to expand the receivership to include the assets of other persons, businesses, or entities to the extent the Receiver reasonably believes that such assets should be added to the Receivership Estate; and

W. To take such other action as may be approved by the Court.

### III. Access to Information

9. Leventhal and his employers, affiliated companies, subsidiaries, joint venture partners, related companies, and any officers, managers, employees, agents, representatives, attorneys, accountants, banks, contractors, subcontractors of each, and all who claim under them, and all other non-parties who have been served with post-judgment discovery in this action by Choate Construction Company, are hereby ordered and directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, Leventhal and/or all Receivership Assets; such information shall include but not be limited to all instruments, papers, documents, records, bank accounts, trust accounts, deposit accounts, saving accounts, money market accounts, and all other demand deposit accounts, inventory, supplies, reservation lists, owners' lists, association records, computer files, computer databases, sales brochures, sales and marketing materials, club records, and any and all other documents and tangible things evidencing or relating to any Receivership Assets.

10. Within three (3) days of the entry of this Order, Leventhal shall turn over to the Receiver all documents and information relating to the sale of the Yoo on the Park and the property located at 1122 Crescent Avenue, Atlanta, Georgia and his direct and indirect interests in any of the proceeds to be generated from the sale of those properties by The Trillist Companies, Inc.

11. Within ten (10) days of the entry of this Order, Leventhal shall file with the Court and serve upon the Receiver and Choate a sworn statement, and accounting, with complete documentation,

12

covering the period from January 1, 2019 to the present:

A.  Of all Receivership Assets, wherever located, held by or in the name of Leventhal, or in which he, directly or indirectly, has or had any beneficial interest, or over which he maintained or maintains and/or exercised or exercises control, including, but not limited to: (a) all securities, investments, funds, real estate, automobiles, jewelry, furniture, gold or other precious metals, and other assets, stating the location of each; and (b) any and all accounts, including all funds held in such accounts, with any bank, brokerage or other financial institution held by, in the name of, or for the benefit of him, directly or indirectly, or over which he maintained or maintains and/or exercised or exercises any direct or indirect control, or in which he had or has a direct or indirect beneficial interest, including the account statements from each bank, brokerage or other financial institution;

B.  Identifying every account at every bank, brokerage or other financial institution: (a) over which Leventhal has signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, Leventhal;

C.  Identifying all credit, bank, charge, debit or other deferred payment cards issued to or used by Leventhal, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve months;

D.  Of all assets received by any of them from any person or entity, including the value, location, and disposition of any assets so received;

E.  Of all expenditures exceeding $1,000 made by Leventhal, including those made on his behalf by any person or entity; and

F.  Of all transfers of assets made Leventhal.

12. Within ten (10) days of the entry of this Order, Leventhal shall provide to the Receiver and Choate copies of Leventhal's unredacted copies of federal and state income tax returns for taxable years 2018-present with all relevant and necessary underlying documentation.

13. Within ten (10) days of the entry of this Order, Leventhal shall provide to the Receiver and Choate copies of all personal and consolidated financial statements of Leventhal with all relevant and necessary underlying documentation.

14. Within ten (10) days of the entry of this Order, Leventhal shall provide to the Receiver and Choate

copies of financial statements or other documents provided to any bank, investor, or lender from 2018 to present to demonstrate his assets and net worth for purposes of obtaining credit or an investment.

15. Leventhal shall answer under oath to the Receiver all questions which the Receiver may put to him and produce all documents as required by the Receiver regarding the business of Leventhal and the Receivership Assets, or any other matter relevant to the operation or administration of the receivership or the collection of funds due to the Choate.

16. Leventhal is required to assist the Receiver in fulfilling his duties and obligations. As such, he must respond promptly and truthfully to all requests for information and documents from the Receiver.

### IV.    Turnover of Assets and Access to Books, Records and Accounts

17. The Receiver is authorized to take immediate possession of all Receivership Assets of any kind and wherever situated, including but not limited to, including, but not limited to, property interests, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights, ownership interests, stocks, membership interests, partnership interests, and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Leventhal owns, possesses, has a beneficial interest in, or controls directly or indirectly. Leventhal and all other persons and entities having control, custody or possession of any Receivership Assets are hereby directed to turn such property over to the Receiver.

18. The Receiver is authorized to take immediate possession of any and all account usernames and passwords, books and records, bank account, investment account, or other financial account information, and all other documents or instruments relating to Leventhal and the Receivership Assets. Leventhal and all other persons and entities having control, custody or possession of any account usernames and passwords, books and records, bank accounts or other financial accounts,

14

and all other documents or instruments relating to Leventhal and the Receivership Assets are hereby directed to turn the same over to the Receiver. The Receiver is entitled to change any usernames or passwords for any bank account, investment account, or other financial account relating to the Receivership Assets.

19. Leventhal, as well as his agents, servants, employees, attorneys, businesses, and any persons or entities acting for or on behalf of Leventhal, and any persons receiving notice of this Order by personal service, certified mail, statutory overnight delivery, U.S. mail, e-mail, facsimile transmission or otherwise, having possession of the property, business, books, records, accounts or assets of Leventhal are hereby directed to deliver the same to the Receiver, his agents and/or employees.

20. All business entities, banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, and of Leventhal that receive actual notice of this Order by personal service, certified mail, statutory overnight delivery, U.S. mail, e-mail, facsimile transmission or otherwise shall:

    A.    Not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Leventhal except upon instructions from the Receiver;

    B.    Not exercise any form of set-off, alleged set-off, lien, or any form of self- help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

    C.    Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the Choate a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice;

    D.    To update that statement at least monthly; and,

    E.      Cooperate expeditiously in providing information and transferring funds, assets and accounts to the Receiver or at the direction of the Receiver.

## V. <u>Access to Real and Personal Property</u>

21. The Receiver is authorized to take immediate possession of all personal property of Leventhal, wherever located, including but not limited to electronically stored information, computers, laptops, hard drives, external storage drives, and any other such memory, media or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments, contracts, mortgages, furniture, office supplies and equipment.  Leventhal and all other persons and entities having control, custody or possession of any such property are hereby directed to turn such property over to the Receiver.

22. The Receiver is authorized to take immediate possession of all real property of Leventhal, wherever located, including but not limited to all ownership and leasehold interests and fixtures. Upon receiving actual notice of this Order by personal service, certified mail, statutory overnight delivery, U.S. mail, e-mail, facsimile transmission or otherwise, all persons other than law enforcement officials acting within the course and scope of their official duties, are (without the express written permission of the Receiver) prohibited from: (a) entering such premises; (b) removing anything from such premises; or (c) destroying, concealing or erasing anything on such premises.  Leventhal and all other persons and entities having control, custody or possession of any such property are hereby directed to turn such property over to the Receiver.

23. In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to the premises described above. The Receiver shall have exclusive control of the keys. Leventhal, or any other person acting or purporting to act on their behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their

possession during the term of the receivership.

24. The Receiver is authorized to open all mail directed to or received by or at the offices or post office boxes of Leventhal, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

25. Upon the request of the Receiver, local sheriffs and law enforcement is hereby ordered to assist the Receiver in carrying out his duties to take possession, custody and control of, or identify the location of, any assets, records or other materials belonging to the Receivership Estate.

## VI. Notice to Third Parties

26. The Receiver shall promptly give notice of his appointment to all known banks, investors, financial institutions, businesses, officers, directors, agents, employees, shareholders, creditors, debtors, managers and general and limited partners of Leventhal, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

27. All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to Leventhal shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such payments shall have the same force and effect as if Leventhal had received such payment.

28. In furtherance of his responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity or government office that he deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estate. All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or Choate.

29. The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail

which is related, directly or indirectly, to the business, operations or activities of any of Leventhal (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, Leventhal. The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail. Leventhal shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver. All personal mail of Leventhal, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver. The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mailbox, depository, business or service, or mail courier or delivery service, hired, rented or used by Leventhal. Leventhal shall not open a new mailbox, or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. mail, a private mail depository or courier service.

30. Subject to payment for services provided, any entity furnishing water, electric, telephone, sewage, garbage or trash removal services to Leventhal shall maintain such service and transfer any such accounts to the Receiver unless instructed to the contrary by the Receiver.

## VII.    Injunction Against Interference with Receiver

31. Leventhal and all persons, financial institutions, businesses, and entities receiving notice of this Order by personal service, certified mail, statutory overnight delivery, U.S. mail, e-mail, facsimile transmission or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

    A.    Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Assets; such prohibited actions include but are not limited to, using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of

18

impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Assets;

B. Hinder, obstruct or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to, concealing, destroying or altering records or information;

C. Dissipate or otherwise diminish the value of any Receivership Assets; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any Receivership Property, enforcing judgments, assessments or claims against any Receivership Property or any Receivership Defendants, attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement executed by any Receivership Defendant or which otherwise affects any Receivership Property;

D. Make any payment or transfer of funds by or on behalf of Defendant Leventhal without providing notice and obtaining the express written approval of the Receiver; or,

E. Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estate.

32. Leventhal and all persons, financial institutions, businesses, and entities receiving notice of this Order by personal service, certified mail, statutory overnight delivery, U.S. mail, e-mail, facsimile transmission or otherwise shall fully cooperate with and assist the Receiver in the performance of his duties.

33. The Receiver shall promptly notify the Court and Choate's counsel of any failure or apparent failure of Leventhal or any persons, financial institutions, businesses, and entities to comply in any way with the terms of this Order.

## VIII. Managing Assets

34. For the Receivership Estate, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Assets (the "Receivership Funds").

19

35. The Receiver's deposit account shall be entitled "Receiver's Account, Estate of Scott L. Leventhal" together with the name of the action.

36. The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Assets, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Assets. The Receiver, with approval of the Court, may also transfer, liquidate, compromise, or otherwise dispose of any Receivership Assets for purposes of satisfying the Choate II Final Judgment.

37. The Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estate, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate. The Receiver, with approval of the Court, may also exercise these powers for satisfaction of the Choate II Final Judgment, and with due regard to the realization of the true and proper value of such real property.

38. The Receiver is authorized to take all actions to manage, maintain, and/or wind- down business operations of the Receivership Estate, including making legally required payments to creditors (including Choate), employees, and agents of the Receivership Estates and communicating with vendors, investors, governmental and regulatory authorities, and others, as appropriate.

39. The Receiver shall not be required to file tax returns on behalf of the Receivership Estate. Leventhal shall be responsible for filing all tax returns in the ordinary course of business, and to the extent taxes are due shall be responsible for notifying the Receiver and requesting payment from the Receivership Estate.

## IX. **Insurance**

40. Given the urgency of the situation to appoint a Receiver, the Receiver accepts this appointment without time for independent verification that appropriate insurance is in place on the property or that appropriate liability or other insurance is in place to protect the assets and the Receivership Estate. Accordingly, the Court acknowledges that the Receiver has no responsibility or liability until such time as he/it can confirm that such insurance is in place or acquire the appropriate insurance. The Receiver will make it apriority to verify or obtain insurance coverage immediately upon this Order Appointing Receiver being entered; however, the Plaintiff, Defendant and Court acknowledge there may be a gap of time before such insurance may be in place to properly protect the assets of the estate and any employees of the estate, and that the Receiver has no responsibility or liability until such time as he/it has notified the Court by filing a notice that insurance is in place.

41. Leventhal is ordered to immediately provide the Receiver with all available insurance information for both existing and prior insurance policies. This includes all applications, policies, riders, correspondence, endorsements, claims and other information. Leventhal is ordered: (1) to advise the insurance agent(s) of this Order in writing, (2) designate all authority over the policies to the Receiver, and (3) take no action with regard to terminating or modifying existing insurance policies.

42. Any insurance broker, agent, carrier, or underwriter is specifically ordered by the Court to cooperate with the Receiver by timely furnishing the following: (1) copies of all insurance policies including any riders, endorsements and applications with respect to policies related to the Receiver Estate, (2) loss history for five consecutive years or for as long as insurance has been in force if less than five years, (3) premium payment history including current status, and (4) any correspondence with insurance agents, brokers and companies. Policies shall be endorsed by Leventhal naming the Receiver as Named Insured and Loss Payee effective the date of this Order as appropriate to the

type of coverage, and evidence of this policy endorsement shall be promptly supplied to the Receiver.

43. The Receiver is hereby authorized to engage insurance brokers and consultants as necessary to properly insure the assets of the Receivership.

## X. <u>Liability of Receiver</u>

44. Until further Order of this Court, the Receiver shall not be required to post bond in accordance with O.C.G.A. § 9-8-10 or give an undertaking of any type in connection with his fiduciary obligations in this matter.

45. The Receiver and his agents, acting within scope of such agency ("Retained Personnel") are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel.

46. Except for an act of gross negligence or willful misconduct, the Receiver and all persons engaged or employed by him shall not be liable for any loss or damage incurred by the parties, or any other person by reason of any act performed or omitted to be performed by them in connection with the discharge of their duties and responsibilities in this matter.

47. This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

48. In the event the Receiver decides to resign, the Receiver shall first give written notice to Choate's counsel of record and the Court of its intention, and the resignation shall not be effective until the Court appoints a successor. The Receiver shall then follow such instructions as the Court may provide.

## XI.  <u>Recommendations and Reports</u>

49. Within fourteen (14) days of the entry date of this Order, the Receiver shall file a status report with the Court. The status report will include a summary of receivership activities to date. It will also include a proposed plan for administering the receivership going forward.

50. Within sixty (60) days after the entry of this Order and quarterly thereafter, the Receiver shall file and serve a full report and accounting of the Receivership Estate (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Assets, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estate.

51. The Quarterly Status Report shall contain the following:

   A.  A summary of the operations of the Receiver;

   B.  The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

   C.  A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

   D.  A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

   E.  A list of all known creditors with their addresses and the amounts of their claims;

   F.  The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

   G.  The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

52. Absent the express approval of the Court, the Receiver's fees—including all fees and costs for the Receiver and others retained to assist in the administration of the Receivership Estate—are capped

at $75,000 during the initial 60-day period following entry of this Order. Further, fee limitations, will be set by the Court after the Receiver submits the first status report.

## XII.   Fees, Expenses and Accountings

53. The Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership. Further, prior Court approval is not required for payments of applicable federal, state or local taxes.

54. Subject to Paragraph 55 immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order.

55. Subject to the limitations in Paragraph 54 above, the Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estate. Such compensation shall require the prior approval of the Court. The Receiver will be paid pursuant to O.C.G.A. § 9-8-13(c).

56. The Receiver is authorized to render a billing statement each month for all reasonable and necessary fees and expenses incurred by the Receiver in discharging his duties under this Order, which billing statement shall be provided to counsel for Defendant Leventhal and Plaintiff Choate. Such parties shall have a period of five (5) business days after receipt of such billing statement to review and object, thereafter the Receiver shall be entitled to pay himself from the funds on hand in the Receivership Estate, provided there are sufficient funds in such accounts to allow such payment. If the funds in such account are insufficient, Plaintiff Choate shall be required to pay the Receiver, provided, however, any such amounts paid shall be added to and recoverable as part of the Choate II Final Judgment against Defendant Leventhal.

## XIII.    Miscellaneous

57. The Receiver is authorized to communicate with all persons, entities and the attorneys for such persons and entities as he deems appropriate to inform them of the status of this matter and the financial condition of the Receivership Estate.

58. This Order shall remain in full force and effect until further order of this Court.

59. A failure by Leventhal to fully cooperate with the Receiver or otherwise comply with this Order shall be under penalty of contempt of court, and the Receiver may request supplemental authority from this Court upon proper motion, if necessary, to obtain the cooperation of the Leventhal or any other persons or entities acting on behalf of or for the Leventhal, to comply fully and completely with this Order.

So Ordered this _27_ day of May 2021.

_____
Honorable Mary Staley Clark
Superior Court of Cobb County, Georgia

s

Order Prepared and Presented by:
**HUDSON LAMBERT PARROTT WALKER, LLC**


_____

KEVIN H. HUDSON
Georgia Bar No. 374630
WILLIAM C. HAYES
Georgia Bar No. 362412

3575 Piedmont Road, Suite 850
Atlanta, Georgia 30305
Telephone:      (404) 554-8183
Facsimile:      (404) 554-8171
E-mail:*khudson@hlpwlaw.com*
E-Mail:*chayes@hlpwlaw.com*
Attorneys for Plaintiff

26

### CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of: Order Appointing Receiver in cases 05-1-6700 and 18-1-5244  by: ( ) Personal Service, ( x) Statutory Electronic Service, ()Interoffice Mail or ( ) placing a copy in the United States mail in a properly addressed envelope with adequate postage thereon to:

Christy, John - jchristy@swfllp.com
Hudson, Kevin H - khudson@hpwlegal.com
Dupree Jr., Hylton B - hdupree@dupree-lawfirm.com
McBryan, Louis lmcbryan@mcbryanlaw.com
Hayes, William chayes@hlpwlaw.com

This the ___26___ day of _____May_____, 20_21_.

Brian Phillips
Judicial Administrative Assistant to
The Honorable Mary Staley Clark
Judge, Cobb Judicial Circuit

# <u>Exhibit B</u>

# Order Denying Protective Order / Stay Pending Appeal of Receiver Order

05-1-6700086130-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

18105244

Mary Staley Clark - 28
JUL 01, 2021 01:25 PM

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

**IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA**

CHOATE CONSTRUCTION COMPANY,              )
                                          )
     Plaintiff,                           )
                                          )
v.                                        )     Civil Action No.:  05-1-6700-28
                                          )                        18-1-5244-28
INTERFINANCIAL PROPERTIES, INC.           )
INTERFINANCIAL MIDTOWN, INC.,             )
PIEDMONT FOUNTAINS, LLC, and SCOTT L.     )
LEVENTHAL,                                )
                                          )
     Defendants.                          )

## ORDER DENYING DEFENDANT SCOTT L. LEVENTHAL'S MOTION FOR PROTECTIVE ORDER OR, IN THE ALTERNATIVE, MOTION TO STAY THE EXECUTION OF THE ORDER APPOINTING RECEIVER

       This matter is before the Court on Defendant Scott L. Leventhal's Motion for Protective Order or, in the Alternative, Motion to Stay the Execution of the Order Appointing Receiver. A hearing on Defendant's Motion was held on June 23, 2021, which the Receiver and all parties attended and for which the Receive and all parties received proper notice. Having considered the Defendant's Motion, the Receiver and the parties' arguments and Briefs, the evidence and objections presented, and all orders and pleading of record in both Civil Action Nos. 05-1-6700 and 18-1-5244, Defendant's Motion is **DENIED**.

       So Ordered, this _____1_____ day of ~~June~~ July, 2021.

                             _____
                             Honorable Mary Staley Clark
                             Superior Court of Cobb County, Georgia

Order Prepared and Presented by:

**HUDSON LAMBERT PARROTT WALKER, LLC**

*/s/ Kevin H. Hudson*
KEVIN H. HUDSON
Georgia Bar No. 374630
WILLIAM C. HAYES
Georgia Bar No. 362412

3575 Piedmont Road, Suite 850
Atlanta, Georgia 30305
Telephone:      (404) 554-8183
Facsimile:      (404) 554-8171
E-mail:*khudson@hlpwlaw.com*
E-Mail:*chayes@hlpwlaw.com*
Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served a copy of: Order Denying Non-Party 13th Street Holdings, LLC'S Emergency Motion To Intervene, Order Denying 13th Street Holdings, LLC'S Emergency Motion to Stay Order Appointing Receiver, Order Denying Defendant Scott L. Leventhal's Motion For Protective Order Or, In The Alternative, Motion To Stay The Execution Of The Order Appointing Receiver, and Rule Nisi in cases 05-1-6700 and 18-1-5244  by: ( ) Personal Service, ( x) Statutory Electronic Service, ()Interoffice Mail or ( ) placing a copy in the United States mail in a properly addressed envelope with adequate postage thereon to:

- Hudson, Kevin H - khudson@hpwlegal.com
- Hayes, Chad chayes@hlpwlaw.com
- Hall, Zack zhall@hlpwlaw.com
- Slaveikis, Fay fslaveikis@hlpwlaw.com
- Dupree Jr., Hylton B - hdupree@dupree-lawfirm.com
- Kirkland, Cindi ckirkland@dupree-lawfirm.com
- Sewell, Henry - hsewell@sewellfirm.com
- Braley, Patrick Patrick.braley@btcpa.net
- Blair, Sara sara.blair@btcpa.net
- McBryan, Louis - alepage@mcbryanlaw.com

This the ____1____ day of ____July____, 20__21__.

Brian Phillips
Judicial Administrative Assistant to
The Honorable Mary Staley Clark
Judge, Cobb Judicial Circuit

# Exhibit C

# Kavana's Counterclaim, Answer and Affirmative Defenses to Claim III of Debtor's Complaint (in Florida Lawsuit)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### Case No. 21-cv-60349-RKA

SCOTT L. LEVENTHAL,

     Plaintiff,

v.

JOSEPH KAVANA,

     Defendant.

_____

JOSEPH KAVANA

     Counter-Plaintiff,

v.

SCOTT L. LEVENTHAL,

     Counter-Defendant.

_____/

## JOSEPH KAVANA'S COUNTERCLAIM, ANSWER AND AFFIRMATIVE DEFENSES TO CLAIM III OF SCOTT LEVENTHAL'S COMPLAINT

### COUNTERCLAIM

Defendant and Counter-Plaintiff Joseph Kavana ("Kavana"), by and through his undersigned attorneys, brings this counterclaim under Rule 13 of the Federal Rules of Civil Procedure against Plaintiff and Counter-Defendant Scott Leventhal ("Leventhal"), and alleges the following:

### INTRODUCTION

1.     Counter-Plaintiff Joseph Kavana sues Counter-Defendant Scott Leventhal and seeks equitable relief for Leventhal's breach of contract. Kavana asks the Court to enforce

Leventhal's removal as Chief Executive Officer and Operating Officer of The Trillist Companies, Inc. ("Trillist" or "Company"), to enjoin him (preliminarily and permanently) from taking any actions on behalf of the Company as Operating Officer, and to strip him of the right to manage the day-to-day operations of Trillist. Although Kavana has already elected to remove Leventhal under § 5.3(c)(ii) of the Shareholders' Agreement of Trillist, which provides that such removal is automatic and self-effectuating, Leventhal refuses to release his tight grip over Trillist. A copy of the Shareholders' Agreement is attached hereto as Exhibit 1.

2.     Kavana and Leventhal each own 50 percent of Trillist, which they founded in 2014 to develop and manage multi-family apartment rental buildings in the United States. Their rights and obligations as shareholders are set out in the Shareholders' Agreement. Under the Agreement, Leventhal was named the Chief Executive Officer and Operating Officer; Kavana was named the Chairman. Although Leventhal was afforded the sole responsibility to run the day-to-day business of the Company, he was obligated to obtain Kavana's advance consent on Major Decisions involving the Company. Leventhal is also obligated to provide Kavana with access to the Company's bank accounts and copies of all relevant financial records.

3.     After five years in business, the parties' relationship began to sour in late 2019 when Kavana began to investigate several issues involving Trillist's first operational Project—a rental building called YOO on the Park in Atlanta, Georgia.

4.     Another source of strain on the parties' relationship was Leventhal's abrupt decision to call off Trillist's second development project—the "1138 Project" at 1138 Peachtree Street, Atlanta Georgia, which was supposed to become a "364-unit high rise apartment building with approximately 53,000 square feet of retail space." Ex. 1 at Ex. A § 7(b).

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

5.      Leventhal claimed his decision to short-circuit the 1138 Project was the result of inadequate funding. Leventhal, however, owns 1138 Peachtree Street through an Affiliate, and stood to benefit directly from the over $1.5 million that Trillist raised from individual investors to develop 1138 Peachtree Street. Only after spending all their money on pre-development costs did Leventhal call off the Project. The Project's investors were left with a worthless investment, while the owners of 1138 Peachtree (which includes Leventhal) got the benefit of their investment dollars.

6.      Thus, what began as issues between Kavana and Leventhal mushroomed into broader issues involving investors and lenders of the Company.

7.      The investors of the 1138 Project accused Leventhal of misappropriating their capital to increase the value of the property at 1138 Peachtree Street.[1] Among the questions they raised is whether the real reason Leventhal called off the 1138 Project was to capture the increased value of the property for himself and his affiliates.

8.      The failure of the 1138 Project coincided with a punitive damages award entered against Leventhal in Cobb County, Georgia, for defrauding his creditors. Notably, Leventhal did not disclose this lawsuit or the judgment to the investors of the 1138 Project—or to Kavana—despite his fiduciary and contractual obligations to do so.

9.      These failures were only the tip of the iceberg. Over the last year, Leventhal has operated Trillist as a sole proprietorship, unlawfully paying himself (and others) millions of dollars while defaulting on numerous debt obligations, blocking Kavana from accessing Trillist's bank

---

[1] All capitalized terms not defined herein shall have the meaning ascribed to them in the Shareholders' Agreement.

accounts, withholding key financial documents and making irreversible changes to Trillist's organizational structure.

10.     In view of Leventhal's extreme misconduct (and several flagrant breaches of the Shareholders' Agreement), on February 11, 2021, Kavana served a removal notice on Leventhal and asked him to execute a written consent to transition day-to-day control of Trillist to Kavana, pursuant to § 5.3(c)(ii) of the Shareholders' Agreement.

11.     Rather than step down, Leventhal doubled down on his inappropriate conduct. Most notably, Leventhal unilaterally—and without Kavana's input—engaged a commercial real estate broker to initiate a sales process to dispose of Trillist's prized—and only operational—Project: YOO on the Park.

12.     Upon information and belief, Leventhal has initiated this process as a thinly veiled, last-ditch effort to neutralize Kavana's efforts to remove him and moot the relief Kavana seeks here by potentially leaving him with no business to operate.

13.     Kavana files this suit for breach of the Shareholders' Agreement, which asks the Court to order Leventhal's removal as Chief Executive Officer and Operating Officer of Trillist, and block him from continuing to irreparably damage the Company through his improper conduct, and order that he cooperate with such removal, including by executing a unanimous written consent to effectuate the transition of day-to-day control.[2]

## PARTIES

14.     Kavana, a Florida resident, owns 50% of Trillist and is the Company's Chairman. He is also a South Florida-based real estate developer.

---

[2]   For the avoidance of doubt, through this action, Kavana seeks only equitable relief, and reserves his right to pursue a claim for damages, where appropriate.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

15.     Leventhal, a Georgia resident, is the Chief Executive Officer and Operating Officer of Trillist, and, like Kavana, is a 50% shareholder of Trillist. Leventhal is also affiliated with another Atlanta-area developer, Tivoli Properties, Inc.

## JURISDICTION, VENUE & APPLICABLE LAW

16.     The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a). There is complete diversity of citizenship between the parties and the value of the equitable relief sought exceeds $75,000.

17.     The parties consented to personal jurisdiction and venue in this forum. *See* Ex. 1 at § 11.3.

18.     The Shareholders' Agreement is governed by the laws of the State of Delaware. Ex. 1 at § 12.2

19.     All conditions precedent to bringing this action have been performed or waived.

## FACTUAL BACKGROUND

**A.      Kavana and Leventhal Become 50% Shareholders of Trillist**

20.     On June 1, 2014, Kavana and Leventhal entered into the Shareholders' Agreement, under which each would have a 50 percent interest in Trillist. The Shareholders' Agreement provides that the "business of the Company shall be to develop, construct, lease, manage and sell residential apartment buildings utilizing the Yoo Marks and designed by Yoo or its Affiliate in major metropolitan cities in the United States of America, in accordance with the Territorial Development Agreement." Ex. 1 at Ex. A § 1.

21.     The Territorial Development Agreement (attached hereto as Exhibit 2) was an agreement between Yoo Design Studios Limited (a company incorporated in the United Kingdom) and KGH International Development, LLC (an Affiliate of Kavana), under which Yoo was "to provide exclusive interior design services" for buildings developed by KGH and its Affiliates.

KGH and its Affiliates could also "utilize the Yoo Marks in conjunction with the marketing and advertising" of the buildings that they developed. Although Trillist was not a party to the Development Agreement, its rights were derivative of KGH's rights, as Trillist was deemed an Affiliate of KGH.

22.     Kavana and Leventhal structured Trillist to operate as a holding company, which through its wholly owned subsidiaries and project-level entities, developed, leased, managed and sold the residential rental units of the Company's Projects.

23.     The Shareholders' Agreement vests day-to-day control of the Company with the Operating Officer only. Ex. 1 at § 5.3.

24.     In accepting the Operating Officer appointment, Leventhal agreed to "skillfully, diligently, and faithfully undertake and perform the day-to-day management of the Business and affairs of the Company (including making recommendations for actions for which the approval of the Shareholders is required) as may be necessary or appropriate thereto." Ex. 1 at § 5.3(a). The Shareholders' Agreement further provides that "the management and operation of the Company shall be vested in the Operating Officer who shall have the power on behalf and in the name of the Company, to carry out any and all objects and purposes of the Company." Ex. 1 at § 5.4(a). Leventhal's managerial responsibility extends to Trillist's wholly owned operating subsidiaries, which include (i) Trillist Management, LLC, (ii) Trillist Development, LLC and (iii) Trillist Realty Advisors, LLC.

25.     Notwithstanding this level of authority over the Company's day-to-day operations, Major Decisions of the Company "require the Approval of the Shareholders." Ex. 1 at § 5.4(b). Section 5.4(b) lists 22 categories of Major Decisions that require the Approval of both Shareholders. For each such Major Decision, the Operating Officer must make a non-binding

recommendation on how to proceed. Ex. 1 at § 5.3(a). The Operating Officer must also arrange to meet monthly with the Shareholders "at a time and place that is mutually acceptable to the Shareholders to discuss the status and affairs of the Company." Ex. 1 at § 5.3(b)(v).

> **B.    Trillist's Organizational Structure**

26.    Trillist can only derive revenues through its subsidiaries and only from the fees (or reimbursements) paid by the Project-level entities. The fee structure for each such subsidiary is set out in the relevant development, management or asset management agreement with each such Project-level entity. Ex. 1 at § 5.12.

27.    Pursuant to the form Business Plan appended to the Shareholders' Agreement, each of the Company's Projects can only be developed by "a separate Project Company" that will in turn be managed by Trillist (through an intermediate entity). Ex. 1 at Ex. A § 2. Put simply, the Project Company has direct ownership and control of the applicable development project, and Trillist (through its subsidiaries) indirectly manages the Project Company for a fee.

28.    The Shareholders' Agreement contemplates that each of the Project Companies would involve a different Project and have its own capital structure. Ex. 1 at § 1.1 (defining "Project" as "a Potential Project Approved by the Shareholders for acquisition, ownership and, if applicable, construction and development").

29.    The Company's Business Plan contemplated two Initial Projects: (1) the first located at "207 13th Street, Atlanta, Georgia 30309 for the development of a 24-story, 245-unit high-rise apartment building with approximately 1,066 square feet of retail space and to be known as 'YOO on the Park'"; (2) the second located "at 1138 Peachtree Street, Atlanta, Georgia 30309 for the development of a[]364-unit high-rise apartment building with approximately 53,000 square feet of retail space" (the "1138 Project"). Ex. 1 at Ex. A § 7.

30.     Kavana and Leventhal later planned to develop a third project at 1122 Crescent Avenue NE, Atlanta, Georgia (the "1122 Crescent Project").

31.     Despite these plans, Trillist achieved Substantial Completion of only *one* such Project—the Project at YOO on the Park. But even that Project has not achieved Stabilization (i.e., an occupancy rate of 85% or more).

32.     Although Leventhal spent millions of dollars in Pursuit Costs on the 1138 Project and the 1122 Crescent Project, neither Project achieved Substantial Completion—or anything close to it.

**C.     Operational Issues Relating to YOO on the Park Become Too Big to Ignore**

33.     In or around April 2019, Kavana and Leventhal agreed to initiate the process to sell or recapitalize YOO on the Park.

34.     This decision whether to sell or recapitalize the Project required the Approval of the Shareholders. *See* Ex. 1 at § 5.4(c)(xv), (xvi).

35.     Leventhal and Kavana further agreed to engage Cushman & Wakefield U.S., Inc., a real estate commercial broker, to assist with the sale of the Project. On a parallel track, Leventhal led discussions with lenders to recapitalize the Project if a sale did not materialize.

36.     After several months of marketing that Project, it became painfully clear that there was no way to erase the stain of YOO on the Park's poor operating performance and dismal occupancy rates, for which Leventhal was solely responsible.

37.     YOO on the Park's suboptimal financial condition attracted no purchase offers that would have yielded anything close to the projected returns used to attract the Project's investors.

38.     Immediately upon learning of the dismal progress of the sales process, Kavana began investigating the root of YOO on the Park's poor performance, and urged Leventhal to reconsider selling YOO on the Park until the building reached Stabilization.

-8-

39.    Upon reviewing YOO on the Park's financials and dismal occupancy rates, Kavana

realized that YOO on the Park was bleeding cash because *Leventhal*, through Trillist, was charging

YOO on the Park exorbitant fees with little to show for it:

> Scott,
>
> I've reviewed your mail and frankly I am not only very disappointed
> but embarrassed too . . . .
>
> I know we agreed that you'd manage the day to day. I need to
> understand how the management Company that you created works
> because I want to make sure that my investors know that
> management was internalized to improve the leasing and the overall
> management of the building *but not to make money*. Specifically, I
> want to show them that you didn't have surplus funds from
> operations that you kept or that you kept leasing fees or other fees.
> *Please make the management company records available . . . .*

40.    Despite numerous follow-ups, Leventhal did not make the management company

records available.

41.    That prompted another letter from Kavana in which he again demanded the

financial reports relating to Trillist's wholly-owned subsidiaries:

> Scott, *I would like to receive these reports ASAP and would like you
> to instruct Tina to provide the exact same reports on a monthly basis
> to [Kavana's colleague] [in accordance with the Shareholders'
> Agreement]*, who will then [facilitate] . . . a monthly conference call
> or a face to face meeting between us in order to discuss the
> information received and prevent any future misunderstandings.
>
> [] [O]nce we have dealt with the refinancing of YOO on the Park I
> want to have a face to face meeting with you to discuss the actual
> status of the Trillist Companies and its affiliates and to agree on
> what our strategy for YOO on the Park, Yoo on Peachtree and
> Crescent should be.

42.    In tandem with these requests, Kavana directed Leventhal to engage an apartment

leasing consultant to assess areas of improvement for YOO on the Park.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

43.     That consultant made several damning discoveries—among them, that the General Manager of YOO on the Park was Leventhal's significant other, Jennie Foster, who had no prior experience managing a luxury rental building (of any size), and was most recently an assistant manager of a small retail outlet in a Atlanta-area mall. To make matters worse, the consultant learned from online reviews that Ms. Foster alienated staff and tenants with abhorrent behavior and remarks.

44.     Against this backdrop, Kavana demanded that Leventhal travel to Miami, Florida for a face-to-face meeting to discuss a path forward.

**D.     Kavana and Leventhal Meet in Miami, Florida on December 14, 2019**

45.     During that in-person meeting on December 14, 2019, Leventhal directed the conversation away from his failings and tried to gauge Kavana's interest in selling his shares of Trillist.

46.     Kavana insisted that he would not sell his interest in Trillist unless Leventhal agreed to:

    a.     Permit a forensic audit of Trillist and its wholly-owned subsidiaries from inception;

    b.     Engage an independent consultant to evaluate the cause of YOO on the Park's poor performance;

    c.     Explain the significant discrepancies relating to the uses of the proceeds of the refinancing of YOO on the Park;

    d.     Effectuate the sale of YOO on the Park and the apartments on 1122 Crescent Avenue;

    e.     Pay past-due debts; and

    f.     Ensure that all investors of the 1138 Project got their capital back.

47.     Leventhal falsely assured Kavana that he would permit the requested audit to go forward. He also promised to begin producing the financial documents that he had withheld.

48.     When those promises, like his earlier ones, proved empty, Kavana gave further written demand, as authorized under the Agreement, for (i) Trillist's financial records, (ii) Trillist's operating budget for Fiscal Year 2020 and (iii) all budgets relating to the development and/or operation of YOO on the Park, the 1138 Project and the 1122 Crescent Project. Kavana also asked to "meet going forward on a monthly basis and that we alternate these meetings between Atlanta and Miami" in accordance with the Shareholders' Agreement.

49.     In response, Leventhal retracted his earlier promises, and committed to only "review the requests [he] made" and objected that the requests were "unduly burdensome, duplicative, [not] reasonably accessible and . . . barred by the doctrine of laches." Leventhal also advanced the made-up claim that Kavana's "request fail[ed] to follow the notice and other applicable provisions of the governance agreements of the Company and others."

50.     Leventhal's non-committal response prompted a second letter from Kavana. He again demanded immediate production of "all historical information required by the Agreements to have been produced and maintained on a recurring basis." Kavana also asked for immediate access to "all company [bank] accounts." Kavana warned Leventhal that the "continuing breach of our rights to access [] the requested information as a 50% Shareholder of Trillist . . . would constitute gross negligence and willful misconduct by you as the Operating Officer of Trillist and will be appropriately and immediately redressed."

51.     Despite all of Kavana's demands and notices that Leventhal was in breach of his contractual and fiduciary duties, Leventhal was unmoved. Rather than comply with the requests, he repeatedly tried to steer the discussion to force Kavana to sell Leventhal his interest in the Company. But Leventhal's buyout offer would go nowhere because it was predicated on Leventhal making full and accurate disclosures, which he had repeatedly shown he would not do.

E.    **Leventhal's Mismanagement Spawns Several Demands and Lawsuits**

52.    Kavana was not the only one questioning whether Leventhal had engaged in misconduct.

53.    On February 25, 2020, Thrillist ATL, LLC ("Thrillist ATL"), a member of a Trillist Project Company, threatened suit against Leventhal, Trillist and TRA 1138 Sponsor, LP ("TRA 1138) (the applicable Project Company), raising allegations of "mismanagement, waste, [and] other acts of wrongdoing."

54.    Thrillist ATL demanded information on how its investment monies were "expended in connection with the Project" given that Leventhal claimed the Company had no money to redeem its investment.

55.    Thrillist ATL's allegations were echoed by another investor of TRA 1138, GSY Atlanta, LLC. GSY asserted that:

> A review of certain expenditures made by [a Trillist-owned subsidiary] or its affiliates in furtherance of the project reveals that [the Trillist-owned subsidiary] *used all of the Company's capital on pre-development activities, which did nothing except enrich the property owner of the real property (and any improvements thereon) located at 1138 Peachtree Street, NW, Atlanta, Georgia (the "Property")*. On top of that, it appears the General Partner used all of GSY's capital contribution to pay for services rendered years before GSY made its investment. GSY's investment is now apparently worthless.

56.    The root of these allegations was Leventhal's inability to articulate how their capital vanished if the 1138 Project was not, as he claimed, viable.

57.    The investors questioned further whether Leventhal had an ulterior motive in calling off the 1138 Project given his ownership interest in the 1138 Peachtree Street property.

58.    Backed into a corner, Leventhal revealed that he had used *all* of the investors' capital to pay *past-due* invoices for activities to prep 1138 Peachtree Street for development.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

59.     This disclosure implicated Leventhal directly because his affiliate owned 1138 Peachtree Street and that property benefited directly from these expenditures. Leventhal thus begged Kavana to support a settlement between Trillist and the investors of TRA 1138 to thwart any direct claims against him or the Company.

60.     Indeed, Leventhal's own counsel admitted the claims were "very serious" with the potential for "very serious ramifications."

61.     When Kavana refused to go along with Leventhal's plan to settle the investors' claims without the additional clarifying information he sought, Leventhal became so desperate for leverage over Kavana that he concocted a frivolous shareholder derivative action against Kavana, and asked him to accept service of the draft complaint.

62.     Leventhal never filed the frivolous lawsuit; it was just another desperate bluff.

**F.      Leventhal's Causes Trillist to Default on Two Separate Loans, Creating Catastrophic Foreclosure Risk**

63.     Leventhal's bad acts relating to the 1138 Project were just the tip of the iceberg.

64.     As a result of his gross mismanagement, Leventhal caused Trillist and two Tier Companies to default under several lending agreements.

65.     The first such default involved the 1122 Crescent Project and arose because Leventhal failed to make over $350,000 in interest payments under a preferred equity agreement with a lender of 1122 Crescent Land Holdings, LLC (a Trillist Tier Company).

66.     The second such default involved a $300,000 Promissory Note that Trillist entered into with an individual lender, and failed to pay on the maturity date of June 8, 2019. The Promissory Note received a guaranty from a Trillist subsidiary that had an ownership interest in YOO on the Park.

67.     For each default, Leventhal tried to coerce Kavana into making hundreds of thousands of dollars of capital contributions.

68.     Like he told the investors of the 1138 Project, Leventhal represented that Trillist did not have enough capital to satisfy the loan obligations and forbearance payments to avoid a foreclosure, hiding the fact that the Company had been paying Leventhal and others almost $1.5 million per year in salaries—an exorbitant amount for a company of Trillist's small size.

69.     When Kavana questioned "how Trillist had no capital to address [the debt payments] at maturity but paid over $1 million in salaries and other payments" to Leventhal and others, Leventhal went radio silent.

### G.     Leventhal Continues His Stunning Pattern of Obstruction

70.     In the midst of all of this turmoil, Leventhal continued through most of 2020 to push Kavana to sell his shares of the Company, but those negotiations went nowhere, as Leventhal steadfastly refused to disclose all of the Company's financial records.

71.     With no resolution in sight, Kavana again renewed his requests with formal demands (i) to audit the books and records of Trillist and its wholly-owned subsidiaries; (ii) for access to Trillist's bank accounts; and (iii) for the documents that Leventhal had to produce under the Shareholders' Agreement but did not.

72.     Kavana also asked for all documents submitted in connection with a loan that Trillist had apparently secured under the U.S. Small Business Administration's Paycheck Protection Program (PPP), and without Kavana's prior requisite approval. Kavana only learned about the loan via a publicly available database of PPP information, and was particularly interested in how it was possible that Trillist could report salaries of almost $2 million when the Company was managing only a single rental building.

-14-

73.     Leventhal responded on February 10, 2021. Although Leventhal's counsel indicated that production of the records requested would be forthcoming, Leventhal now claimed that the records were available only in hard-copy, and insisted that he would only make the documents available for an in-person inspection at the Company's office in Atlanta, Georgia.

74.     With respect to the bank account access, Leventhal asserted that he contacted the relevant bank "repeatedly in an attempt to move [the] process forward" of giving Kavana access to the accounts. He blamed the delay on not knowing Kavana's mother's maiden name, which he said he "need[ed] to complete the paperwork." Yet, to date, Leventhal has still not provided the required bank access, despite having all the information he requested.

75.     Finally, with respect to the PPP loan, Leventhal revealed the striking fact that he had been paying himself, his significant other and other management-level employees' salaries of over a million dollars (collectively) without Kavana's prior approval, in direct breach of the Agreement.

76.     Among the most questionable payments were those Leventhal made to himself and to Frank Spears—a construction consultant. The payments to Spears were especially curious, as Trillist has not engaged in any construction activity for *years*.

**H.     Kavana Removes Leventhal Pursuant to § 5.3(c)(ii) of the Shareholders' Agreement**

77.     As a consequence of Leventhal's material breaches of the Shareholders' Agreement and his willful misconduct, Kavana asked Leventhal to execute a written consent to transition operating control of Trillist to Kavana on February 11, 2021, pursuant to § 5.3(c)(ii) of the Shareholders' Agreement.

78.     Section 5.3(c)(ii) provides in relevant part that if:

> [T]here has been an act of gross negligence, willful misconduct or
> fraud by the Operating Officer . . . or the Operating Officer has

-15-

> breached any material term of this Agreement . . . then in each case, at the election of the Shareholder that is not the Operating Officer and *effective immediately* upon written notice to the Operating Officer, the current Operating Officer shall *automatically* cease to be the Chief Executive Officer and the Operating Officer, and the Non-Defaulting Shareholder shall automatically become the Chief Executive Officer and the Operating Officer of the Company and shall be deemed to possess all of the powers and duties of the Operating Officer hereunder.

Ex. 1 at § 5.3(c)(ii) (emphasis added).

79.     Kavana gave Leventhal until 5 p.m. on February 12, 2021 to comply with § 5.3(c)(ii). If did not, Kavana warned Leventhal that he would seek immediate judicial intervention to enforce his rights.

80.     Just minutes before 5 p.m. on February 12, Leventhal, in a race to the courthouse, filed a lawsuit of his own, alleging among other things, that despite what the Shareholders' Agreement provides, Kavana could not deny him day-to-day management of the Company.

81.     Leventhal refuses to step down as Operating Officer of Trillist.

**I.      Leventhal's Misconduct Gets More Brazen as He Goes into Damage Control Mode**

82.     As of the filing of this counterclaim, Kavana has not received access to any of Trillist's bank accounts, despite demanding access on February 10, 2020 and January 20, 2021, and supplying Leventhal with his mother's maiden name, and all other information requested of Kavana, on February 22, 2021.

83.     In a further breach of the Shareholders' Agreement, Leventhal unilaterally began the process of listing YOO on the Park for sale without Kavana's prior input.

84.     Leventhal also began a lengthy interview process with several commercial real estate brokers, which culminated with a heavily negotiated Listing Agreement that a Trillist

subsidiary entered into with Cushman & Wakefield U.S., Inc. Leventhal did not share the Listing

Agreement with Kavana or seek his consent (or input) before entering into the Agreement.

85.     Kavana only discovered the fact that YOO on the Park was listed for sale through

Internet research.

86.     These brazen acts of misconduct have the potential to wreak irreparable harm on

Trillist and its Project Companies.

87.     Kavana has no adequate remedy at law to remedy Leventhal's refusal to step down

as Operating Officer of Trillist or his refusal to grant Kavana access to the Company's bank

accounts.

88.     Kavana has retained the undersigned attorneys to represent them in this action and

has agreed to pay them reasonable attorneys' fees for their services in this cause.

## COUNT I
## (BREACH OF THE SHAREHOLDERS' AGREEMENT)

89.     Kavana re-alleges paragraphs 1 through 88 as if fully set forth herein.

90.     Leventhal breached § 5.7(a) of the Shareholders' Agreement by refusing to give

Kavana access to the Company's bank accounts and refusing to secure the Approval of Kavana

for "withdrawals and disbursements from the Company's accounts individually in excess of

Twenty Thousand and No/100 Dollars ($20,000.00)." Leventhal further breached § 5.7(b) by

failing to deliver to Kavana "a reconciliation of the Company's bank accounts" on or before the

fifteenth (15th) day of each calendar month.

91.     Leventhal further acted willfully and in breach of the Agreement in paying himself

hundreds of thousands of dollars in salary payments—and likely much more—while

disingenuously claiming that the Company had no capital to fund various debt obligations. *See*

Exhibit A to Ex. 1 at § 3(b) ("In no event shall the Shareholders be required to make any Additional

Capital Contributions to the Company to fund any salaries to the Shareholders, and all such salaries shall be paid solely from the Fees that are earned by the Company, *to the extent available therefor*."). Leventhal also failed to secure Kavana's requisite Approval to pay his significant other (and Affiliate), Jennie Foster, *over $100,000* annually to serve as General Manager of YOO on the Park. Ms. Foster's previous experience was limited to serving as "Store Manager" of an athleisure apparel store and an Assistant Store Manager of a women's hosiery brand.

92.    Leventhal further acted unlawfully and in breach of the Agreement by "obligat[ing] the Company, any Tier Company or any subsidiary of the Company, under [a] borrowing or refinancing by the Company, any Tier Company or any subsidiary of the Company" without Kavana's consent. Ex. 1 at § 5.4(b)(xvi). He also failed to disclose the *existence* of such borrowings, despite his duty to do so.

93.    Leventhal further acted unlawfully and in breach of the Agreement by hiring management-level employees, and paying them, collectively, millions of dollars, without Kavana's Approval as required by § 5.4(b) of the Shareholders' Agreement.

94.    Leventhal further acted unlawfully and in breach of the Agreement by engaging countless professionals—including attorneys, architects, interior designers and market research firms in connection with the 1138 Project, the 1122 Crescent Project and at least one litigation— without Kavana's Approval as required by § 5.4(b) of the Shareholders' Agreement. Leventhal used the funds from Thrillist ATL and GSY Atlanta's equity investment in the 1138 Project to make these payments, which ultimately benefitted 1138 Peachtree Land Holdings, LLC—a Leventhal Affiliate which owns the land at 1138 Peachtree Street. Leventhal's failure to secure Kavana's Approval of these expenditures is also a violation of § 5.3(b)(ii), which required Leventhal to "[p]repare budgets for any and all reasonable Pursuit Costs . . . that are estimated to

be incurred in connection [with] pursuing the development of the Projects *for Approval by the Shareholders*."

95.    Leventhal further acted unlawfully and in breach of § 5.4(b) of the Agreement by failing to secure his Approval to re-start the sales process of YOO on the Park and entering into an Exclusive Listing Agreement with Cushman & Wakefield U.S., Inc. without Kavana's input or consent as required by the Shareholders' Agreement.

96.    Leventhal further acted unlawfully and in breach of the Agreement by failing to make timely disclosure of the numerous financial records Leventhal was required to provide under the Shareholders' Agreement, and "as may be reasonably requested by the Shareholders." Ex. 1 at § 6.1(b).

97.    Section 5.3(c)(ii) of the Shareholders' Agreement provides that

> In the event that: (A) there has been an act of gross negligence, willful misconduct or fraud by the Operating officer; or (B) the Operating Officer has failed to materially abide by any approved Development Budget or Development Plan; . . . or (D) the Operating Officer has breached any material term of this Agreement . . . then, in each case, at the election of the Shareholder that is not the Operating Officer *and effective immediately* upon written notice to the Operating Officer, *the current Operating Officer shall automatically cease to be the Chief Executive Officer and the Operating Officer, and the Non-Defaulting Shareholder shall automatically become the Chief Executive Officer and the Operating Officer of the Company and shall be deemed to possess all of the powers and duties of the Operating Officer hereunder*.

Ex. 1 at § 5.3(c)(ii) (emphasis added).

98.    Leventhal is subject to removal under § 5.3(c)(ii) for each act of willful misconduct and each breach of the material term of the Shareholders' Agreement.

99.    Leventhal is further subject to removal for committing an act of fraud, as Leventhal was held liable in *Choate Constr. Co. v. Scott L. Leventhal, et al.*, for defrauding creditors by creating new entities and transferring assets to those entities to avoid making payment. 2016 WL 10689628,

at *1 (Ga. Sup. Ct. Nov. 21, 2016) (entering judgment "against Defendant Scott Leventhal individually for punitive damages").

100.    On February 11, 2021, Kavana gave written notice to Leventhal under § 5.3(c)(ii) of the Shareholders' Agreement that, effective immediately, he had to relinquish his role as Chief Executive Officer and Operating Officer, and sign a written consent effectuating the transition of his role as Chief Executive Officer and Operating Officer to Kavana.

101.    Section 5.3(c)(ii) provides in relevant part that:

> Notwithstanding that the transition of the office of the Chief Executive Officer and the Operating Officer is intended under this Section 5.3(c)(ii) to be automatic and no further action required to effect such transition, at the request of the Non-Defaulting Shareholder, *the Defaulting Shareholder agrees to take such further action as the Non-Defaulting Shareholder may request to effect the transition, including, without limitation, execution of a unanimous consent in lieu of a Shareholders' meeting or a Directors' meeting to formally evidence the transition.*

Ex. 1 at § 5.3(c)(ii) (emphasis added).

102.    In further breach of the Agreement, Leventhal did not step down as the Chief Executive Officer and Operating Officer. Nor did he assist in transitioning his day-to-day responsibilities to Kavana.

103.    Leventhal's refusal to comply with § 5.3(c)(ii) and § 5.7 of the Shareholders' Agreement poses significant and continuing irreparable harm to Kavana and the Company.

**WHEREFORE** Counterclaim Plaintiff Kavana respectfully requests that the Court:

(a)    Order Leventhal to provide immediate access to all of Trillist's bank accounts, including those of its wholly owned subsidiaries;

(b)    Issue a temporary restraining order, preliminary injunction and permanent injunction requiring Leventhal to comply with § 5.3(c)(ii), including by transitioning the office of the Chief Executive Officer and the Operating

-20-

Officer to Kavana, executing a written consent to effectuate such transition and barring Leventhal from taking any further action as an officer of Trillist;

(c)     Award Kavana his attorneys' fees, costs and expenses under § 11.5 of the Shareholders' Agreement and other applicable laws; and

(d)     Award such other and further relief as may be just and proper.

### JOSEPH KAVANA'S ANSWER AND AFFIRMATIVE DEFENSES TO
### CLAIM III OF PLAINTIFF'S COMPLAINT

Defendant Joseph Kavana ("Kavana"), by and through its undersigned attorneys, hereby files its Answer and Affirmative Defenses to Claim III of Plaintiff Scott Leventhal's ("Leventhal") Complaint.[3] Kavana denies each and every allegation not expressly admitted, and reproduces the headings from the Complaint for reference only and without admitting anything contained in those headings.

1.      Defendant admits that Plaintiff and Defendant are each 50% shareholders of The Trillist Companies, Inc. ("Trillist" or the "Company"), and admits that the parties dispute whether Leventhal may continue managing the day-to-day affairs of Trillist. Defendant further admits that Plaintiff purports to be in doubt about his rights under Shareholders' Agreement, and the other governing documents of Trillist. Defendant otherwise denies Plaintiff's allegations in paragraph one.

### THE PARTIES

2.      Defendant admits that he sought to remove Leventhal as Chief Executive Officer and Operating Officer of Trillist as a result of various bad acts, and that Leventhal refuses to step down as Chief Executive Officer and Operating Officer of Trillist. Defendant otherwise denies Plaintiff's allegations in paragraph two.

3.      Admitted.

4.      Admitted.

---

[3] Because Defendant Joseph Kavana has filed a Motion to Dismiss Claims I and II of Plaintiff's Complaint, he does not answer those claims at this time, as his deadline for answering is tolled under Fed. R. Civ. P. 12(a)(4)(A) until, and only if, the Court denies Kavana's Motion.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

**JURISDICTION AND VENUE**

5.      Defendant admits that Plaintiff purports to seek relief under the federal declaratory judgment statute, the Delaware Declaratory Judgment Act and Rule 57 of the Federal Rules of Civil Procedure. Defendant otherwise denies Plaintiff's allegations in paragraph five.

6.      Admitted.

7.      Admitted.

**SUBSTANTIVE ALLEGATIONS**

**A.      Background**

8.      Admitted.

9.      Plaintiff purports to characterize the Company's Shareholders' Agreement and the Territorial Development Agreement, each of which speaks for itself; otherwise denied.

10.      Admitted.

11.      Defendant admits that KGH International Development, LLC is an affiliate of Defendant, but denies Plaintiff's characterization that he "solely control[s]" KGH.

12.      Plaintiff purports to characterize several provisions of the Shareholders' Agreement, which speaks for itself; otherwise denied.

13.      Defendant is without knowledge or information of whether use of the YOO brand (or its design services) was a valuable and material inducement for Leventhal to enter the Shareholders' Agreement, and thus denies the allegations of Paragraph 13.

14.      Plaintiff purports to characterize several provisions of the Shareholders' Agreement, which speaks for itself; otherwise denied.

15.      Plaintiff purports to characterize § 10.2 of the Shareholders' Agreement, which speaks for itself; otherwise denied.

16.     Plaintiff purports to characterize § 10.2 of the Shareholders' Agreement, which speaks for itself; otherwise denied.

17.     Plaintiff purports to characterize § 10.2 of the Shareholders' Agreement, which speaks for itself; otherwise denied.

18.     Plaintiff purports to characterize the meaning and importance of several provisions of the Shareholders' Agreement, each of which speaks for itself, and is without information or knowledge as to why Leventhal negotiated various provisions and thus denies the remaining allegations in paragraph 18.

19.     Plaintiff purports to characterize several provisions of the Shareholders' Agreement, each of which speaks for itself; otherwise denied.

20.     Plaintiff purports to characterize § 10.4(b) of the Shareholders' Agreement, which speaks for itself; otherwise denied.

21.     Plaintiff purports to characterize § 10.5 of the Shareholders' Agreement, which speaks for itself; otherwise denied.

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     Admitted.

26.     Admitted.

27.     Defendant admits that KGH has never transferred or assigned its interest in the Territorial Development Agreement to the Company, but denies Plaintiff's characterization that it never attempted to do so.

**B.      Approval of the Pursuit of the 1138 Project**

28.      Defendant admits that he consented to allow Trillist to pursue the development of

the real property at 1138 Peachtree Street NW, Atlanta, Georgia; otherwise denied.

29.      Denied.

**C.      The Termination of the Territorial Development Agreement**

30.      Admitted.

31.      Defendant admits that the Territorial Development Agreement is no longer in full

force and effect; otherwise denied.

32.      Denied.

33.      Denied.

34.      Denied.

35.      Denied.

36.      Denied.

**D.      The Present Dispute**

37.      Plaintiff purports to characterize a written notice that he delivered on February 10,

2020, which speaks for itself; otherwise denied.

38.      Plaintiff purports to characterize a written notice that he delivered on February 10,

2020, which speaks for itself; otherwise denied.

39.      Denied.

40.      Plaintiff purports to characterize Defendant's response to Plaintiff's February 10,

2020 written notice, which speaks for itself; otherwise denied.

41.      Denied.

42.      Plaintiff purports to characterize a letter he received from Defendant, dated

December 23, 2020, which speaks for itself; otherwise denied.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

43.     Plaintiff purports to characterize his response to Defendant's December 23, 2020, which speaks for itself; otherwise denied.

44.     Admitted that Plaintiff produced only the fiscal year 2019 financial statements of Trillist; otherwise denied.

45.     Plaintiff purports to characterize the financial statements he delivered to Defendant and § 10.6 of the Shareholders' Agreement, which speak for themselves. Defendant otherwise denies Plaintiff allegations in paragraph 45.

46.     Plaintiff purports to characterize a letter he received on January 20, 2021, which speaks for itself; otherwise denied.

47.     Plaintiff purports to characterize a letter he received on January 26, 2021, which speaks for itself; otherwise denied.

48.     Denied.

49.     Defendant admits that he advised Leventhal that he would proceed with litigation in the Southern District of Florida if Leventhal denied the equitable relief he sought; otherwise denied.

50.     Plaintiff purports to characterize a letter sent to Defendant on January 20, 2021, which speaks for itself; otherwise denied.

51.     Defendant admits that his demands for the Company's records have been directed to Leventhal as Chief Executive Officer and Operating Officer of the Company, and in accordance with the procedures set forth in the Shareholders' Agreement and the directions of Leventhal's counsel; otherwise denied.

52.     Plaintiff purports to characterize § 12.2 of the Shareholders' Agreement, which speaks for itself; otherwise denied.

53.     Plaintiff purports to characterize a section of the Delaware General Corporation Law, which speaks for itself; otherwise denied.

54.     Plaintiff purports to characterize a letter he sent on February 10, 2021, which speaks for itself; otherwise denied.

55.     Admitted.

56.     Plaintiff purports to characterize the Shareholders' Agreement, which speaks for itself; otherwise denied.

57.     Plaintiff purports to characterize the Shareholders' Agreement, which names Kavana as Chairman of the Trillist Company; otherwise denied.

58.     Plaintiff purports to characterize the Shareholders' Agreement, which names Leventhal as Operating Officer, President, Chief Executive Officer and Secretary of the Company; otherwise denied.

59.     Plaintiff purports to characterize the By-Laws of the Company, which speak for themselves; otherwise denied.

60.     Plaintiff purports to characterize the By-Laws of the Company, which speak for themselves; otherwise denied.

61.     Plaintiff purports to characterize the Shareholders' Agreement and By-Laws of the Company, which speak for themselves; otherwise denied.

62.     Plaintiff purports to characterize § 5.3(c) of the Shareholders' Agreement, which speaks for itself; otherwise denied.

63.     Plaintiff purports to characterize § 5.3(c) of the Shareholders' Agreement, which speaks for itself; otherwise denied. Further, this paragraph contains legal conclusions to which no response is required.

64.    Plaintiff purports to characterize a letter his counsel received on February 11, 2021, which speaks for itself; otherwise denied.

65.    Plaintiff purports to characterize a letter his counsel received on February 11, 2021, which speaks for itself; otherwise denied. Further, this paragraph contains legal conclusions to which no response is required.

66.    Denied.

67.    Denied.

68.    Denied.

69.    Denied.

## CLAIMS FOR RELIEF

### CLAIM III
**(Declaratory Judgment that Defendant Cannot Remove Plaintiff as President, Secretary, and Member of the Board of Directors of the Company)**

81.    Defendant incorporates by reference and re-alleges his answers to paragraphs 1-69 as though fully set forth herein.

82.    Defendant denies the allegations made in paragraph 82 of the Complaint.

83.    In paragraph 83 of the Complaint, Defendant admits that Plaintiff purports to seek declaratory relief regarding his rights under the Shareholders' Agreement; otherwise denied.

84.    Defendant denies that Plaintiff is entitled to the relief he seeks in paragraph 83 of the Complaint.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

**AFFIRMATIVE DEFENSES**

1.      Kavana asserts the following defenses pursuant to Federal Rule of Civil Procedure 8(c). Kavana undertakes the burden of proof as to only those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein. Further, Kavana reserves the right to amend his Answer if additional defenses become apparent through the course of this action, and Kavana reserves the right to assert any and all defenses on which he does not bear the burden of proof.

**First Affirmative Defense (Unclean Hands)**

2.      Plaintiff's claims are barred in whole or in part by the doctrine of Unclean Hands. Leventhal has engaged in a series of bad acts and willful misconduct, as detailed in Kavana's Counterclaim, which is incorporated as if fully set forth herein, including engaging in fraud and various material breaches of the parties' Shareholder Agreement that bar Leventhal from seeking the equitable relief that he seeks here.

**Second Affirmative Defense (Lack of Jurisdiction)**

3.      Leventhal's claim for declaratory relief in Claim III fails to present a justiciable controversy, as Leventhal alleges that Kavana is attempting to remove Plaintiff from his positions as the Company's President and Secretary and as a member of the Company's Board of Directors. However, Kavana has never made such a claim and does not demand that Leventhal be stripped of those titles. Thus, there is no present justiciable controversy, so the Court lacks jurisdiction to adjudicate the declaratory relief claim in Claim III.

4.      Kavana reserves the right to assert all applicable defenses and counterclaims and/or amend this Answer, once the precise nature of the relevant circumstances or events is determined through discovery.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

WHEREFORE, Defendant, Joseph Kavana respectfully requests the entry of judgment in his favor, costs, attorneys' fees, and such additional relief the Court deems just and proper.

Dated: March 26, 2021

Respectfully submitted,

STEARNS WEAVER MILLER ALHADEFF SITERRSON & WEISSLER P.A.

By: */s/ Albert D. Lichy*

Maria A. Fehretdinov
Florida Bar No. 52084
mfehretdinov@stearnsweaver.com
Albert D. Lichy
Florida Bar No. 94272
alichy@stearnsweaver.com
150 West Flagler Street, Suite 2200
Miami, Florida 33130
(305) 789-3200 Telephone
(305) 789-3395 Facsimile

*Counsel to Joseph Kavana*

# **<u>Exhibit D</u>**

# **Property Listing for Yoo on the Park**

Register (/Register?ContinueUrl=%2FListings%2F28600)    Log In

**CUSHMAN &
WAKEFIELD**

**EXHIBIT P-16**

(L).

Main Menu
## View Property Listings (/Listings?Status=Active)
View All (/Listings?Status=Active)
By Office
National Leadership (/Listings?Status=Active&OfficeID=25&Order=Suggested)
Atlanta (/Listings?Status=Active&OfficeID=1&Order=Suggested)
Augusta (/Listings?Status=Active&OfficeID=69&Order=Suggested)
Austin (/Listings?Status=Active&OfficeID=23&Order=Suggested)
Baltimore (/Listings?Status=Active&OfficeID=55&Order=Suggested)
Birmingham (/Listings?Status=Active&OfficeID=36&Order=Suggested)
Boston (/Listings?Status=Active&OfficeID=5&Order=Suggested)
Charleston (/Listings?Status=Active&OfficeID=66&Order=Suggested)
Charlotte (/Listings?Status=Active&OfficeID=37&Order=Suggested)
Cincinnati (/Listings?Status=Active&OfficeID=50&Order=Suggested)
Dallas (/Listings?Status=Active&OfficeID=4&Order=Suggested)
Fort Lauderdale (/Listings?Status=Active&OfficeID=48&Order=Suggested)
Houston (/Listings?Status=Active&OfficeID=6&Order=Suggested)
Indianapolis (/Listings?Status=Active&OfficeID=47&Order=Suggested)
Jacksonville (/Listings?Status=Active&OfficeID=7&Order=Suggested)
Kansas City (/Listings?Status=Active&OfficeID=51&Order=Suggested)
Las Vegas (/Listings?Status=Active&OfficeID=61&Order=Suggested)
Miami (/Listings?Status=Active&OfficeID=17&Order=Suggested)
Minneapolis (/Listings?Status=Active&OfficeID=30&Order=Suggested)
Nashville (/Listings?Status=Active&OfficeID=33&Order=Suggested)
New York - Metro (/Listings?Status=Active&OfficeID=21&Order=Suggested)
Oklahoma City (/Listings?Status=Active&OfficeID=58&Order=Suggested)
Orlando (/Listings?Status=Active&OfficeID=2&Order=Suggested)
Philadelphia (/Listings?Status=Active&OfficeID=10&Order=Suggested)
Phoenix (/Listings?Status=Active&OfficeID=18&Order=Suggested)
Raleigh (/Listings?Status=Active&OfficeID=34&Order=Suggested)
Rogers, AR (/Listings?Status=Active&OfficeID=71&Order=Suggested)
Sacramento (/Listings?Status=Active&OfficeID=60&Order=Suggested)
St. Louis (/Listings?Status=Active&OfficeID=56&Order=Suggested)
Tampa (/Listings?Status=Active&OfficeID=12&Order=Suggested)
Washington, DC (/Listings?Status=Active&OfficeID=3&Order=Suggested)
West Palm Beach (/Listings?Status=Active&OfficeID=70&Order=Suggested)
By Specialty
Affordable Housing (/Listings?Status=Active&SpecialtyID=29&Order=Suggested)
Institutional (/Listings?Status=Active&SpecialtyID=64&Order=Suggested)
Student Housing (/Listings?Status=Active&SpecialtyID=62&Order=Suggested)
Search (/Listings?Search=Active)
Listing Map (/Maps/Bing/Listings?ShowTitles=True&ShowSubtitles=True&PinStyle1=RedCircle&Status=Active&ReturnURL=%2FListings%2F28600)
## Market Research (/Research)
OUR OFFICES (/OFFICES)
View Map (/Offices)
National Leadership (/Offices/National%20Leadership)
Atlanta (/Offices/Atlanta)
Augusta (/Offices/Augusta)
Austin (/Offices/Austin)
Baltimore (/Offices/Baltimore)
Birmingham (/Offices/Birmingham)
Boston (/Offices/Boston)
Charleston (/Offices/Charleston)

Charlotte (/Offices/Charlotte)
Cincinnati (/Offices/Cincinnati)
Dallas (/Offices/Dallas)
Fort Lauderdale (/Offices/Fort%20Lauderdale)
Houston (/Offices/Houston)
Indianapolis (/Offices/Indianapolis)
Jacksonville (/Offices/Jacksonville)
Kansas City (/Offices/Kansas%20City)
Las Vegas (/Offices/Las%20Vegas)
Miami (/Offices/Miami)
Minneapolis (/Offices/Minneapolis)
Nashville (/Offices/Nashville)
New York - Metro (/Offices/New%20York%20-%20Metro)
Oklahoma City (/Offices/Oklahoma%20City)
Orlando (/Offices/Orlando)
Philadelphia (/Offices/Philadelphia)
Phoenix (/Offices/Phoenix)
Raleigh (/Offices/Raleigh)
Rogers, AR (/Offices/Rogers%2c%20AR)
Sacramento (/Offices/Sacramento)
St. Louis (/Offices/St.%20Louis)
Tampa (/Offices/Tampa)
Washington, DC (/Offices/Washington%2c%20DC)
West Palm Beach (/Offices/West%20Palm%20Beach)
OUR SPECIALTIES (/SPECIALTIES)
Affordable Housing (/Specialties/Affordable%20Housing)
Institutional (/Specialties/Institutional)
Student Housing (/Specialties/Student%20Housing)
PAST SALES (/LISTINGS?STATUS=SOLD)
View All (/Listings?Status=Sold)
By Office
National Leadership (/Listings?Status=Sold&OfficeID=25)
Atlanta (/Listings?Status=Sold&OfficeID=1)
Augusta (/Listings?Status=Sold&OfficeID=69)
Austin (/Listings?Status=Sold&OfficeID=23)
Baltimore (/Listings?Status=Sold&OfficeID=55)
Birmingham (/Listings?Status=Sold&OfficeID=36)
Boston (/Listings?Status=Sold&OfficeID=5)
Charleston (/Listings?Status=Sold&OfficeID=66)
Charlotte (/Listings?Status=Sold&OfficeID=37)
Cincinnati (/Listings?Status=Sold&OfficeID=50)
Dallas (/Listings?Status=Sold&OfficeID=4)
Fort Lauderdale (/Listings?Status=Sold&OfficeID=48)
Houston (/Listings?Status=Sold&OfficeID=6)
Indianapolis (/Listings?Status=Sold&OfficeID=47)
Jacksonville (/Listings?Status=Sold&OfficeID=7)
Kansas City (/Listings?Status=Sold&OfficeID=51)
Las Vegas (/Listings?Status=Sold&OfficeID=61)
Miami (/Listings?Status=Sold&OfficeID=17)
Minneapolis (/Listings?Status=Sold&OfficeID=30)
Nashville (/Listings?Status=Sold&OfficeID=33)
New York - Metro (/Listings?Status=Sold&OfficeID=21)
Oklahoma City (/Listings?Status=Sold&OfficeID=58)
Orlando (/Listings?Status=Sold&OfficeID=2)
Philadelphia (/Listings?Status=Sold&OfficeID=10)
Phoenix (/Listings?Status=Sold&OfficeID=18)
Raleigh (/Listings?Status=Sold&OfficeID=34)
Rogers, AR (/Listings?Status=Sold&OfficeID=71)
Sacramento (/Listings?Status=Sold&OfficeID=60)
St. Louis (/Listings?Status=Sold&OfficeID=56)
Tampa (/Listings?Status=Sold&OfficeID=12)
Washington, DC (/Listings?Status=Sold&OfficeID=3)
West Palm Beach (/Listings?Status=Sold&OfficeID=70)

By Specialty
Affordable Housing (/Listings?Status=Sold&SpecialtyID=63)
Institutional (/Listings?Status=Sold&SpecialtyID=64)
Student Housing (/Listings?Status=Sold&SpecialtyID=62)
Search (/Listings?Search=Sold)
Sale Map (/Maps/Bing/Listings?ShowTitles=True&ShowSubtitles=True&PinStyle1=TealCircle&Status=Sold&ReturnURL=%2FListings%2F28600)
ABOUT (/ABOUT)
CONTACT US (/CONTACT)
HOME (/)

# YOO on the Park

**POSTED: 3/22/2021**

  



url=mailto%3A%3Fbody%3Dhttps%253A%252F%252Fmu
%2520The%2520Multifamily%2520Advisor

 

Want to add this to **MY LISTINGS** (or tell us why you're not interested)?
LOG IN (/LOGIN?RETURNURL=%2FLISTINGS%2F28600) or REGISTER (/REGISTER?
CONTINUEURL=%2FLISTINGS%2F28600) ...

## 242
UNITS



https://maps.google.com/maps?ll=33.78508,-84.38053&z=14&t=m&hl=en-US&gl=US&mapclient=apiv3)

Map data ©2021 Google

207 13th Street
Atlanta, GA  30309
(Fulton County)

**TYPE:**  Conventional

## CONTACTS

### Robert Stickel
**EXECUTIVE VICE CHAIR**

WORK +1 404 442 5609
(tel:+14044425609 )

CELL +1 404 550 0855
(tel:+14045500855 )

EMAIL robert.stickel@cushwake.com
(mailto:robert.stickel@cushwake.com)

VCARD download»

### Alex Brown
**MANAGING DIRECTOR**

WORK +1 404 853 5274
(tel:+14048535274 )

CELL +1 513 910 7601
(tel:+15139107601 )

EMAIL alex.brown@cushwake.com
(mailto:alex.brown@cushwake.cc

YOO ON THE PARK

## About YOO on the Park

**OFFERS DUE:  TUESDAY, APRIL 20, 2021**  (/DOWNLOAD/ICAL?TYPE=CFO&ID=28600)

The Cushman & Wakefield Sunbelt Multifamily Advisory Group is excited to present the exclusive listing of YOO on the Park, a Core asset in an irreplaceable Midtown Atlanta location. A true luxury collector's aspiration, YOO on the Park is the closest multifamily high-rise to Atlanta's renowned 185-acre Piedmont Park. Featuring striking unobstructed skyline views, the property offers short walks to the Atlanta Botanical Garden and the Atlanta BeltLine Trail, as well as many other popular Midtown destinations. Sustained by its location and an extraordinary high style design aesthetic, YOO on the Park affords an energetic urban lifestyle sought-after by affluent Atlantans. The property is perfectly positioned to benefit from Midtown's robust economic growth and 30K+ jobs arriving over the next 2-3 years. As the product of an experienced developer with unique attention to detail, YOO on the Park is primed for substantial investment appreciation.

**Ashlyn Warren**
SENIOR FINANCIAL ANALYST

WORK | +1 404 645 7276
(tel:+14046457276 )

CELL | +1 229 630 6966
(tel:+12296306966 )

EMAIL | ashlyn.warren@cushwake.com
(mailto:ashlyn.warren@cushwake

VCARD | download»

**Michael Kay**
FINANCIAL ANALYST

WORK | +1 404 682 3439
(tel:+14046823439 )

CELL | +1 678 787 0496
(tel:+16787870496 )

EMAIL | michael.kay@cushwake.com
(mailto:michael.kay@cushwake.c

VCARD | download»

Click here to sign the Confidentiality Agreement electronically.

Signing the Confidentiality Agreement will unlock any confidential documents for this listing.

Already signed it?  Remember to log in.



| FILE | CREATED | S |
|---|---|---|
| ⎙ Confidentiality Agreement.pdf | 3/22/2021 | 71 I |

View Property Listings
(/Listings?Status=Active)

Market Research (/Research)

Home (/)
About (/About)
Contact Us (/Contact)
Cushman & Wakefield Global
(http://www.cushmanwakefield.com)

**OUR OFFICES (/OFFICES)**

National Leadership
(/Offices/National%20Leadership)
Atlanta (/Offices/Atlanta)
Augusta (/Offices/Augusta)
Austin (/Offices/Austin)
Baltimore
(/Offices/Baltimore)
Birmingham
(/Offices/Birmingham)
Boston (/Offices/Boston)
Charleston
(/Offices/Charleston)
Charlotte (/Offices/Charlotte)
Cincinnati
(/Offices/Cincinnati)
Dallas (/Offices/Dallas)
Fort Lauderdale
(/Offices/Fort%20Lauderdale)
Houston (/Offices/Houston)
Indianapolis
(/Offices/Indianapolis)
Jacksonville
(/Offices/Jacksonville)
Kansas City
(/Offices/Kansas%20City)

Las Vegas
(/Offices/Las%20Vegas)
Miami (/Offices/Miami)
Minneapolis
(/Offices/Minneapolis)
Nashville (/Offices/Nashville)
New York - Metro
(/Offices/New%20York%20-
%20Metro)
Oklahoma City
(/Offices/Oklahoma%20City)
Orlando (/Offices/Orlando)
Philadelphia
(/Offices/Philadelphia)
Phoenix (/Offices/Phoenix)
Raleigh (/Offices/Raleigh)
Rogers, AR
(/Offices/Rogers%2c%20AR)
Sacramento
(/Offices/Sacramento)
St. Louis
(/Offices/St.%20Louis)
Tampa (/Offices/Tampa)
Washington, DC
(/Offices/Washington%2c%20DC)
West Palm Beach
(/Offices/West%20Palm%20Beach)

**OUR SPECIALTIES
(/SPECIALTIES)**

Affordable Housing
(/Specialties/Affordable%20Housing)
Institutional
(/Specialties/Institutional)
Student Housing
(/Specialties/Student%20Housing)

**FOLLOW CUSHMAN & WAKEFIELD**


(http://facebook.com/CushmanWakefieldUnitedSta


(http://twitter.com/cushwakeus)

in
(http://linkedin.com/company/cushman-&-
wakefield)

(https://www.instagram.com/cushwakeamericas/)

© 2021 CUSHMAN & WAKEFIELD, INC.
(HTTP://WWW.CUSHMANWAKEFIELD.COM)
ALL RIGHTS RESERVED.

WEBSITE BY CHARLES GREGORY
DESIGN BY PIXELWISE DIGITAL
(HTTP://PIXELWISEDIGITAL.COM)

# Exhibit E

# Curbed Atlanta Article dated February 25, 2020

# Developer Trillist offloading Midtown hotel site across from 46-story residential project

atlanta.curbed.com/2020/2/25/21152121/atlanta-midtown-developer-trillist-sls-sbe-hotel-sale

Sean Richard Keenan                                                                    February 25, 2020



The low-rise Crescent Place Apartments operate on the site now.
*Google Maps*

A prime piece of real estate has hit the market in Midtown, across the street from the development site of a potentially skyline-altering tower project.

Exactly what's happening with the previously proposed hotel project isn't clear.
*Trillist*

Developer Trillist, which owns both 1122 Crescent Avenue and 1138 Peachtree Street, recently put the former parcel up for sale, ostensibly opting to focus on the company's proposed 46-story residential high-rise at the latter site, according to a report by Bisnow.

Trillist has enlisted Cushman & Wakefield to offload the 0.65-acre site, where the humble Crescent Place Apartments currently operate.

That site is where Los Angeles-based hotel operator SBE has been planning to open Atlanta's first SLS boutique hotel, per the report.

An SBE spokesperson told the publication it had inked a hotel management agreement to deliver the SLS lodge, although further details are unclear.

1/4

According to Trillist's plans from 2016, the Crescent Avenue mixed-use project was slated to ascend 42 stories and feature 213 hotel rooms and 56 condos.
Although the property is expected to attract much interest, size constraints at the site could make parking for a very large project tricky, as Bisnow relays.



 

The 1138 Peachtree project seems to be Trillist's focus now.
*Trillist, via <u>Midtown Alliance</u>*

The move to sell the property could spell good news for Atlanta development watchers who've been tapping their feet on the 1138 Peachtree project, which has been teased since 2013.

If realized, the 46-story development would be the tallest tower built in Atlanta in more than a decade, standing more than 550 feet—roughly the height of the Marriott Marquee Hotel.

The project would include 317 apartments and 10,000 square feet of ground-level retail space, stacked atop a nine-story, 450-space parking deck.



## Next Up In <u>Atlanta Development News</u>

# <u>Exhibit F</u>

# Yoo on the Park Organization Chart



Organizational Chart
yoo on the Park Project
(13th Street, Atlanta, Georgia)
Revised (02-11-15)

CHART 1

BOO-004047

# Exhibit G

# 1122 Crescent Call for Offers

Click here to view with images.
To ensur  delive y to your inbox, please add us to your address book.



## Asset Overview

| | | |
|---|---|---|
| Site Address | 1122 Crescent Ave \| Atlanta, GA | View Video |
| Size | 0.63± Acres \| 27,636± sf | |
| Zoning | SPI-16 Subarea 1 | Sign Confidentiality Agreement |
| Potential Density | 359,570± sf | |
| Submarket | Midtown | Sign Co-Brokerage Agreement |
| Walk Score | 90 - Walker's Paradise | |

**For more information please contact:**

**Pierce Owings**
Managing Director
404 853 5350
pierce.owings@cushwake.com

**Matt Hawkins**
Managing Director
404 853 5204
matt.hawkins@cushwake.com

1180 Peachtree Street
Suite 3100
Atlanta, GA 30309
Main +1 404 875 1000

**Join the Conversation:**

cushmanwakefield.com

 **Forward This Email**

Global Headquarters: Cushman & Wakefield | 225 W. Wacker Drive, Suite 3000 | Chicago, IL 60606 | USA

If you are not the intended recipient of this email, or you wish to unsubscribe from our mailing list, please click here.

©2019 Cushman & Wakefield. The information contained in this communication is confidential, may be privileged and is intended for the exclusive use of the above named addressee(s). If you are not the intended recipient(s), you are expressly prohibited from copying, distributing, disseminating, or in any other way using any information contained within this communication. If you have received this communication in error please contact the sender by telephone or by response via e-mail. We have taken precautions to minimize the risk of transmitting software viruses, but we advise you to carry out your own virus checks on any attachment to this message. We expressly disclaim liability for any loss or damage caused by software viruses. FURTHERMORE, NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, IS MADE TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN, AND SAME IS SUBMITTED SUBJECT TO ERRORS, OMISSIONS, CHANGE OF PRICE, RENTAL OR OTHER CONDITIONS, WITHDRAWAL WITHOUT NOTICE, AND TO ANY SPECIAL LISTING CONDITIONS IMPOSED BY THE PROPERTY OWNER(S). AS APPLICABLE, WE MAKE NO REPRESENTATION AS TO THE CONDITION OF THE PROPERTY (OR PROPERTIES) IN QUESTION.

# Exhibit H

# Florida Consent Order

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-60349-CIV-ALTMAN/Hunt

**SCOTT LEVENTHAL**,

    *Plaintiff*,

*v.*

**JOSEPH KAVANA**,

    *Defendant.*

_____/

## ORDER RESOLVING *EXPEDITED* MOTION FOR TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION

The Defendant and Counter-Plaintiff Joseph Kavana ("Kavana") filed an Expedited Motion for Entry of a Temporary Restraining Order or, in the Alternative, a Preliminary Injunction, and Request for Hearing, and Incorporated Memorandum of Law (the "Motion") [ECF No. 36].

**WHEREAS**, since Kavana's filing of the Motion, the parties notified the Court that they have conferred and amicably resolved the issues in the Motion such that the parties agree to and do not oppose the terms of the order outlined herein (the "Order");

**ACCORDINGLY**, the Court, having reviewed the Motion, its Opposition, and Declarations and other evidence submitted in support and the relevant pleadings, and being otherwise fully advised in the premises, finds as follows:

A dispute has arisen between Kavana and Plaintiff and Counter-Defendant Scott L. Leventhal's ("Leventhal") concerning their respective rights, duties, and obligations under the June 1, 2014 Shareholders' Agreement of The Trillist Companies, Inc. ("Trillist" or the "Company"), which has resulted in the filing of the above-styled litigation.

"To obtain a preliminary injunction, [the movant] bears the burden of proving: (1) substantial likelihood of success on merits; (2) substantial threat of irreparable injury; (3) that threatened injury to plaintiff outweighs potential harm to defendant; and (4) that injunction will not be adverse to the public interest." *Diversified Sols., Inc. v. Ohwook! Prods., Inc.*, 2021 WL 1601834, at *1–2 (S.D. Fla. Apr. 23, 2021) (citing *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016); *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002)). "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001).

In this case, the Court finds evidence of a significant dispute and lack of trust between the parties concerning the management of a corporation in which they each own 50% of the stock. The parties disagree concerning the merits of each other's claims, but they agree that the following consent order helps preserve the status quo and otherwise assists the parties to conduct business until the factual and legal issues in this case can be fully and finally resolved. Accordingly, the Court finds that the following consent order is appropriate and necessary and will remain in place pending the final resolution of this litigation.

Therefore, it is **ORDERED and ADJUDGED** as follows:

1.      The Motion [ECF No. 36] is **GRANTED**.

2.      The Plaintiff's Unopposed Motion to Allow Electronic Equipment at the Hearing [ECF No. 64] is **DENIED as moot**.

3.      Within two business days following the entry of this Order, Leventhal shall complete all necessary documentation to give Kavana full and complete access to all of the banks accounts listed in **Exhibit A**, and any other bank accounts to which he has access as Operating Officer of Trillist, except for the account at PNC Bank, to which Mr. Leventhal purportedly has view-only access. For

the avoidance of doubt, Kavana agrees to not, without Leventhal's prior written consent, transfer any funds to or from the bank accounts.

4.     Without the express written consent of Kavana or the approval of the Court, during the pendency of the Litigation, Leventhal shall not directly or indirectly cause or permit Trillist, Trillist Management, LLC, Trillist Development, LLC, Trillist Realty Advisors, LLC, TPKG 13th Street Sponsor, LLC, TPKG 13th Street Holdings, LLC, TPKG 13th Street Member, LLC, TPKG 13th Street Development, LLC, 1122 Crescent Avenue Land Member, LLC, 1122 Crescent Avenue Land Holdings, LLC, TRA 1138 Sponsor, GP, LLC TRA 1138 Sponsor, LP, LLC or any affiliate thereto (the "Trillist Entities") to:

(a)     Make any payments or distributions to Leventhal or any Affiliate of Leventhal, including but not limited to Tivoli Investment, LLC, Blue Horseshoe Investments, LLC, Fulcrum Loan Holdings, LLC, 13th Street Holdings LLC and Tivoli Properties, Inc., or any affiliate thereto (the "Leventhal Affiliated Entities"); provided, however, that Leventhal may be paid a gross salary of $16,000 per month from the date of this Order to and through the later of (i) August, 31, 2021 or (ii) the date on which the sale of Yoo on the Park closes. Leventhal shall not be paid any additional compensation or bonuses by the Trillist Entities without the written consent of Kavana.

(b)     Enter into any future transaction, contract, agreement, arrangement or deal involving Leventhal and/or the Leventhal Affiliate Entities;

(c)     Make any payment(s), transfer(s) of funds, deposit(s), or disbursement(s) to any Person that exceeds $10,000 (individually or in the aggregate throughout the course of the Litigation);

(d)     Distribute any of the proceeds arising from the of the sale of Yoo on the Park or 1122 Crescent Avenue NE, Atlanta, Georgia without Kavana's direct involvement and approval; or

(e)     Open any new bank, deposit, checking, savings, current, or other money market account(s) in the name of Trillist, the Trillist Entities or any Affiliate thereto.

5.     Leventhal shall provide prior immediate written notice to Kavana of any proposed transaction, expenditure or transfer of funds covered under Paragraphs 2. Subject to Paragraph 4 below, Kavana will, after receiving the information requested, have 1 business day to approve or

disapprove of any such transaction or expenditure. Also subject to Paragraph 4 below, a failure to respond within 1 business day after receiving the information requested pursuant to Paragraph 4 shall constitute approval.

6.      Leventhal shall supply Kavana with all information reasonably requested by Kavana to grant or withhold consent to any proposed transfer of funds or any proposed transaction or expenditure covered under Paragraph 2.

7.      No later than 1 business day after the entry of this Order, Leventhal shall supply (i) all drafts of any schedule reflecting the projected sources and uses of the proceeds of the sale of TPKG 13th Street Development, LLC (i.e., Yoo on the Park), (ii) all drafts of any schedule prepared regarding projected and final closing expenses and distributions from the sale of Yoo on the Park, and (iii) a current operating budget for Yoo on the Park. Leventhal's obligation to circulate all drafts of (i) and (ii) is ongoing, and applies to the sale of any Trillist Project.

8.      No later than 1 business day after the entry of this Order, Leventhal shall disclose a schedule of all employees of all the Trillist Entities and all budgeted salaries and distributions for each such employee.

9.      No later than 5 days following the entry of this Order, Leventhal shall disclose to Kavana the details of any transactions (including the dates, amounts, and current status of any monies to be exchanged) between Trillist or the Trillist Entities, on the one hand, and Leventhal or the Leventhal Affiliated Entities, on the other, from January 1, 2016 through the present.

10.     In no event may Leventhal make a Major Decision, as defined by § 5.4(b) of the Shareholders' Agreement, without getting Kavana's prior written approval. If the parties disagree about whether a decision qualifies as a Major Decision, either party may submit that dispute to the Court within 2 business days of reaching such disagreement. If there is no disagreement on whether

a decision qualifies as a Major Decision, the parties must abide by the dispute resolution procedure set forth in § 5.4(c).

11.     In no event may Leventhal may relinquish his responsibilities as Chief Executive Officer or Operating Officer without first (i) executing a unanimous consent in lieu of a Shareholders' meeting to formally evidence the transition of Chief Executive Officer and Operating Officer to Kavana (ii) complying with all reasonable informational and access requests made by Kavana to effectuate the transition of Chief Executive Officer and Operating Officer, and (iii) otherwise facilitating the transition of each such officer role through any reasonable requests made by Kavana to effectuate such transition.

12.     Unless and until otherwise modified or vacated by the Court or both parties in a signed writing, this Order shall remain in full force and effect until the resolution of the Litigation.

13.     Except as otherwise stated herein: nothing contained in this Order shall be construed as an admission or denial by any of the parties hereto, or any of them, as to the merits of any of the claims against them, or the merits of any defenses pled or which could have been pled to any of the claims, or any future claim; this Order is being entered without prejudice or waiver of any of the party's rights, claims, defenses, or remedies with respect to the claims, disputes and controversies asserted in this litigation, or any future or pending litigation, legal or other proceedings by, between or among the parties or any of their Affiliates; any and all such rights, claims, defenses, or remedies are hereby expressly reserved whether arising in this Litigation, or any future or pending litigation, legal or other proceedings by, between or among the parties or any of their Affiliates.

14.     The Confidential Information provision set forth in Section 10.6 of the Shareholders' Agreement shall govern any Confidential Information supplied to the Shareholders pursuant to this Order;

15.     Upon application and a hearing, the Court may enter an award of sanctions and/or attorneys' fees upon a finding of any willful breach of this Order.

16.     The parties will preserve and not destroy or tamper with any documents related to the claims and defenses in this Litigation, including all electronic communications between the parties and among the parties' representatives.

17.     The Court reserves jurisdiction over this Order as necessary to further its purposes.

18.     Kavana shall not be required to post a bond as a condition of the entry of this Order.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 28th day of June 2021.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record